In re Manuel SANTOS Louise Santos, Debtors.

Manuel & Louise SANTOS, Plaintiffs,

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and Edward Sparkman, Trustee, Defendants.

Bankruptcy No. 87–03443F.
Adv. No. 88–0438F.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 13, 1989.

Roger V. Ashodian, Delaware County Legal, Chester, Pa., for debtors/plaintiffs, Manuel Santos and Louise Santos.

Michael M. Baylson, U.S. Atty., Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for defendant, U.S. Dept. of Housing and Urban Development.

Edward Sparkman, Philadelphia, Pa., defendant/standing Chapter 13 trustee.

## OPINION

BRUCE I. FOX, Bankruptcy Judge:

The instant adversary proceeding challenges a proof of claim filed by the Department of Housing and Urban Development (HUD). In so doing, it raises difficult questions regarding the effect of a chapter 13 proceeding on the mortgage assignment program operated by HUD.

On July 9, 1987 the debtors filed a voluntary petition in bankruptcy under chapter 13. Thereafter, HUD filed a proof of claim, in accordance with local Bankr.R. 3001.1(b), which stated that the amount needed by the debtors to cure their prepetition mortgage arrearage was $25,110.88 and the amount needed to pay the secured debt in full was $50,499.01. (Ex. G–18.) In Count I of their complaint, the debtors contend that both of the figures are inflated; in Count III of their complaint, the debtors seek equitable relief which would direct HUD to comply with certain directives connected with HUD's mortgage assignment program.[1]

### I.

After a two day trial, I make the following findings of fact:

1. On June 26, 1978, the debtors purchased the real property located at 1198 Taylor Drive, Folcroft, Pennsylvania.

2. In order to purchase this property, debtors borrowed $27,350.00 from Fidelity Bond and Mortgage Co. A mortgage agreement (Ex. G–1) was entered into between these parties to secure the loan. The mortgage agreement was later assigned to the Commonwealth of Pennsylvania School Employees' Retirement Fund.

3. This mortgage agreement was insured by HUD pursuant to section 221 of the National Housing Act. (Ex. G–2.)

4. Under the terms of the mortgage, the debtors were to pay $220.00 per month, plus escrow for taxes and fire insurance (as well as a service charge), for thirty years, with a mortgage interest rate of 9%.

5. By January 1980, the debtors were no longer making mortgage payments as required by their security agreement. They were informed by the mortgagee that they could request that HUD take an assignment of their mortgage; if an assign-

---

1. Count II, which requested recoupment for alleged violations of the federal Truth-in-Lending Act, 15 U.S.C. §§ 1601 *et seq.*, was dismissed upon pretrial motion. *In re Santos,* Adv. # 88–0438, mem. (Bankr.E.D.Pa., September 16, 1988).

ment were granted, it might assist them in avoiding foreclosure.

6. The debtors made such a request, and on September 5, 1980 they were informed that HUD accepted the mortgage assignment.

7. On September 24, 1980, Commonwealth of Pennsylvania School Employees' Retirement Fund assigned the mortgage to HUD.

8. On September 9, 1980, the debtors entered into a "Forbearance Agreement" with HUD, to cover the period October 1, 1980 through March 1, 1981. Under the terms of this contract, *inter alia*, HUD agreed to accept $150.00 per month from the debtors. If these payment were made, then HUD could not foreclose, despite the mortgage delinquency. The agreement also stated that "all rights and obligations of the original note and mortgage, except as changed by this Forbearance Agreement, remain in full force."

9. On August 10, 1981, HUD and the debtors entered into another forbearance agreement, identical to the initial agreement, except this contract covered the period September 1, 1981 through June 1, 1982.

10. On August 16, 1982, the debtors and HUD entered into a third forbearance agreement, identical to the previous two, covering the period September 1, 1982 through October 1, 1983.

11. Although there were gaps in the periods covered by these three agreements, the parties do not dispute that it was the intention of HUD and the debtors that between October 1, 1980 and October 1, 1983, the debtors were obligated to pay HUD only $150.00 per month, and if such payments were made, HUD agreed not to foreclose.

12. Although not all payments were made timely, the debtors did pay to HUD $5,400.00 during the life of these three

forbearance agreements, which represents 36 payments of $150.00 each.

13. When HUD accepted assignment of this mortgage, the debtors had been credited with 17 mortgage payments, i.e., payments through December 1, 1979. Thus, on the date of assignment, the debtors had an unpaid mortgage balance of $27,078.30. (Ex. G–20.)

14. During the life of those three forbearance agreements, HUD continued to accrue interest on the unpaid principal balance of $27,078.30 at the contract rate. Therefore, interest accrued at a monthly rate in excess of $150.00 per month. Thus, by HUD's calculations, the unpaid balance due HUD for principal and earned interest was increasing during the terms of the forbearance agreements.[2]

15. The method by which HUD credited forbearance payments received was confused and confusing. First, no credit was applied until at least a total of one full regular monthly mortgage payment was received. Thus, credit for payments received was made only after two forbearance payments were in hand, as the normal monthly mortgage payment was, with escrows, approximately $294.00 (N.T. Oct. 12, 1988 at 118–119).

16. In addition, HUD initially credited the forbearance payments "horizontally" to unpaid advances (e.g. taxes, insurance), arrears, interest and principal. In January 1983, HUD began to credit payments "vertically," first to unpaid escrow advances, then to escrow, interest, and principal.

17. After the third forbearance agreement expired, HUD entered into another "forbearance agreement"[3] dated August 17, 1983. (Ex. G–8.) Under the terms of this agreement, the debtors were to resume full monthly mortgage payments (including escrows) of $294.09 on September 1, 1983, and to pay this monthly amount through

---

**2.** Interest was accruing at approximately $203.00 per month. Thus, according to HUD, the debtors were falling behind $53.00 per month even though they were substantially complying with the forbearance agreements.

The debtors termed this "negative amortization" in their posttrial submissions.

**3.** Although labelled a "forbearance agreement," the HUD witnesses also referred to it as a "repayment agreement" to distinguish this agree-

August 31, 1984.[4] Again, this agreement stated that "all rights and obligations of the original note and mortgage, except as changed by this Forbearance Agreement, remain in full force."

18. Under this agreement the debtor paid to HUD only $948.50 (N.T. Nov. 21, 1988 at 71), rather than the total due of $3,529.08.

19. On October 1, 1984, the debtors signed another "forbearance agreement" for the period October 1, 1984 through August 31, 1985 (Ex. G–10) (identical to the agreement labelled Ex. G–8), which required monthly payments of $295.00. No payments under this agreement were made.

20. Due to a shortage of HUD personnel, no consultation between HUD and the debtors occurred before or after the forbearance agreements dated August 17, 1983 and October 1, 1984 were signed (N.T. Nov. 21, 1988 at 65–66).

21. HUD has accrued interest on the unpaid loan principal and loan advances made since accepting this assignment in September 1980.

22. On October 24, 1985 HUD sent a letter to the debtors stating that they were "12 months delinquent," and requesting that the debtors communicate with HUD to make arrangements "to bring [their] account current." (Ex. G–11.) The debtors did not communicate with HUD.

23. On November 12, 1985, HUD sent the following letter to the debtors:

November 12, 1985
CERTIFIED MAIL #
RETURN RECEIPT REQUESTED
Manuel & Louise Santos
1198 Taylor Drive
Folcroft, PA 19032
Dear: Mr. & Mrs. Santos:
Subject: Final Notice
 Defaulted Secretary Held Mortgage
FHA Case # 441–250205–3221
Log No. P–638
Account No. 06–019906–4

We are writing you for the last time concerning your defaulted mortgage account. No payment has been credited to your account since Oct., 1984 and the total delinquency is now $3988.40 under the terms of your Forbearance Agreement.

We will regret being forced to take so drastic an action as foreclosure; but your indifference to your obligation may leave us with no alternative.

In view of the above, you have two options to avoid foreclosure:

1. You may remit your total delinquency under the terms of your Forbearance Agreement in the amount of $3988.40 to this office within five days.

2. You may offer a voluntary deed to your property to this office for consideration. Under certain circumstances, we may be able to accept your deed rather than institute foreclosure action against you.

You have seven (7) days from the date of this letter in which to contact Ms. Skinner at (215) 597–3414 regarding these options. You may contact us anytime between 8:30 am and 5:00 pm Monday through Friday.

THIS IS A FINAL NOTICE

Sincerely,
Joseph Russell
Chief
Loan Management Branch

(Ex. G–12.)

Again, the debtors did not respond.

24. On December 2, 1985, HUD sent the following letter to the debtors:

Dec. 2, 1985

Manuel & Louise Santos
1198 Taylor Drive
Folcroft, PA 19032

SUBJECT: NOTICE OF INTENTION TO FORECLOSE AND ACCELERATE MORTGAGE BALANCE

ment from earlier ones which allowed the debtors to pay less than normal mortgage payments.

**4.** This period overlaps with the earlier forbearance agreement by one month.

PHA CASE No: 441–250205–3221

MORTGAGED PREMISES: 1198 Taylor Dr., Folcroft, PA 19032

LOG # : P–638

THRIFT # : 06–019906–4

Dear: Mr. & Mrs. Santos:

1. The Secretary of Housing and Urban Development is the holder of the first mortgage (and Note) on the above premises.

2. As of the date of this notice, THE MORTGAGE IS IN DEFAULT STATUS. The amount required to place the account current as of <u>Dec. 1, 1985</u> is $<u>17703.93.</u>

3. The amount of money that you will have to remit to prevent foreclosure is $<u>17703.93.</u> The payment must be in the form of cashier's check or certified check made payable to the Secretary of Housing & Urban Development and must be <u>received</u> at our office shown above not later than THIRTY (30) days from the date of this letter.

4. In the event payment as specified in paragraph 3 is not made WITHIN THIRTY (30) days from the date of this letter, it is the intention of the holder to accelerate (declare the entire mortgage due and payable immediately) the mortgage obligation and all other lawful charges, and instruct our attorney to institute mortgage foreclosure proceedings. We would consider accepting a deed in lieu of foreclosure providing the property is free from any liens or encumbrances.

5. (a) If you wish to cure the default within thirty (30) days from the date of this letter, you must pay the TOTAL AMOUNT DUE stated above, plus an additional monthly installment if payment is made after the 1st day of next month, plus an additional late charge if one is due at time of payment and not included above.

(b) If payment is made after thirty (30) days from the date of this letter, but before foreclosure proceedings have been started, the amount you will have to pay will also include the regular monthly installments and late charges then due, and any title report costs.

The exact amount which has been incurred can be obtained by contacting this office.

Should you have further questions with regard to this matter, feel free to contact <u>Ms. Skinner</u> at (215) <u>597–3414.</u>

Sincerely,

/s/ Joseph Russell

Chief

Loan Management Branch

(Ex. G–13.) The debtors did not respond to this correspondence.

25. The only attempts by HUD to communicate with the debtors after October 1, 1985 were the three letters mentioned above, and two attempted visits to the debtors' house by HUD employees on January 16, 1986 and January 29, 1986. No one apparently was home during these attempts to meet with the debtors; nor did the debtors respond to a note left at the premises by the HUD employees. (The debtors did not have telephone service in January 1986.)

26. On February 12, 1986, HUD prepared a document which reflected the following information: the then current principal balance was $26,864.44, which reflected payments credited to this loan account through December, 1980 (Ex. G–15). This information remained unchanged through October 1986 (Ex. G–16) and August 27, 1987 (Ex. G–17).

27. Even though Ex. G–13 stated that the mortgage agreement was accelerated, HUD testified that there was an office policy which gave HUD employees the discretion to accept less than the payment of the full delinquency demanded in Ex. G–13 and to restore the mortgagors to payments under the forbearance agreement both during and after the 30 day period specified in Ex. G–13. (N.T. Nov. 2, 1988 at 39–40, 106–128).

28. Debtors at all times have remained current in their chapter 13 plan payments.

## II.

I reach the following legal conclusions:

 1. To the extent the terms of the HUD forbearance agreements signed by

the debtors differ from and are more stringent than the terms of the HUD assignment program as detailed in the HUD regulations or HUD Handbook 4330.2, the terms of the forbearance agreements are not enforceable due to the consent decree signed by HUD in the class action lawsuit known as *Ferrell v. Pierce.*

2. HUD may accrue interest on the unpaid mortgage principal balance after accepting assignment of the mortgage during the forbearance period but only to the extent that the interest accrued does not exceed the debtors' required payments during the forbearance period.

3. Debtors may cure any delinquencies which arose under their forbearance or repayment agreements, pursuant to 11 U.S.C. § 1322(b)(3), (5), when the chapter 13 petition is commenced after HUD has sent notice that the mortgage balance is accelerated but prior to HUD's taking any other foreclosure action.

### III.

The two narrow questions raised by the instant objection to HUD's proof of claim are: whether HUD can accrue interest on the mortgage principal balance (plus loan advances—*viz.,* tax payments) during the 36 month forbearance period, and whether a chapter 13 debtor, whose mortgage was assigned to HUD prepetition, can regain the benefits offered by the assignment program by using chapter 13 to cure a prepetition default when HUD has demanded the entire delinquency (including preassignment delinquency) but has not obtained a foreclosure judgment. In order to resolve these two questions, it is essential to consider the unusual origin and nature of the HUD assignment program.

As part of the National Housing Act, 12 U.S.C. §§ 1701 *et seq.,* which entrusts HUD with achieving the national goal of providing decent, affordable housing to all citizens, *see, e.g., Federal Nat'l Mortgage Assoc. v. Rathgens,* 595 F.Supp. 552, 553 (S.D. Ohio 1984), HUD insures certain mortgage

loans. By rendering these loans virtually risk free, *see, e.g., In re Madison,* 60 B.R. 837, 838 (E.D.Pa.1986), this insurance encourages lenders to issue mortgages to low income individuals who would not otherwise qualify for a home mortgage. *See Butler v. U.S. Dept. of Housing & Urban Dev.,* 595 F.Supp. 1041 (E.D.Pa.1984). The low income of the mortgagors, though, makes these mortgages more susceptible to default on the advent of illness, unemployment, or other misfortune. *See, e.g., Ferrell v. Pierce,* 743 F.2d 454, 456 (7th Cir. 1984); *Harris v. United States Dept. of Housing & Urban Dev.,* C.A. # 85–489, *slip op.* (E.D.Pa. April 8, 1986) [1986 WL 4331] (Fullam, J.); *Brown v. Lynn,* 385 F.Supp. 986, 1000 (N.D.Ill.1974). While the loan risk is protected by insurance, HUD has sought to limit in two distinct ways the possibility of quick foreclosure judgments whenever the homeowners fall behind in mortgage payments. First, HUD issues instructions to lenders which directs lenders to communicate with mortgagors and work with these borrowers, if possible, to avoid foreclosure; this is termed "servicing" the mortgage. In addition, HUD can direct that the lenders assign the mortgage to HUD and thereby allow HUD to deal directly with the mortgagors to avoid foreclosure, if possible.

In 1973, certain homeowners initiated a class action lawsuit against HUD and certain mortgage lenders claiming that, as HUD was not enforcing the servicing directive, quick and inappropriate foreclosures were occurring on mortgages insured by HUD. *Brown v. Lynn.* The district court resolved various motions to dismiss by concluding that these allegations, if proved, demonstrated a violation by HUD of the National Housing Act; however, it also concluded that these servicing directives, found in a HUD authorized "handbook," were not mandatory or binding upon the lenders. Thus, the claims against the mortgage lender defendants were dismissed. *Id. See also Brown v. Lynn,* 392 F.Supp. 559 (N.D.Ill.1975).[5]

---

5. Although the servicing guidelines were viewed as nonbinding for purposes of affirmative federal relief, state courts have begun to accept the failure of a lender to properly service the mort-

■ As a settlement of this lawsuit, HUD entered into a consent decree in 1976, modified in 1979, which, in effect, created a detailed mortgage assignment program. *Ferrell v. Pierce*, 560 F.Supp. 1344 (N.D.Ill. 1983), *aff'd*, 743 F.2d 454 (7th Cir.1984). Under the terms of this consent decree, HUD agreed to take assignments of HUD insured mortgages and to operate the assignment program in accordance with HUD Handbook 4191.2, later renumbered HUD Handbook 4330.2 ("Handbook").[6] *Ferrell v. Pierce*, 560 F.Supp. at 1348. Two paragraphs of the consent decree have been of particular significance. As quoted in *Ferrell v. Pierce*, 560 F.Supp. at 1349:[7]

The Amended Stipulation, which is the focus of both motions, provides in paragraph 3 for HUD's operation of a mortgage assignment program consistent with the terms of the Handbook. Paragraph 3 provides:

HUD Handbook 4191.2 attached hereto as Appendix A, shall constitute binding instructions for implementation of the assignment program subsequent to the entry of this order. The Department shall administer the assignment program substantially in accordance with the terms of said Handbook.... The provisions of the Handbook may be modified in accordance with the Department's usual procedures. However, during the term of this Amended Stipulation the Department will not make any modification which would curtail the basic rights of mortgagors under the program now in existence. The Department will give notice to plaintiffs' counsel prior to final action on any modification.

The duration of the obligations created by the Amended Stipulation is set out in paragraph 14 of that agreement, which provides:

Except as provided in this paragraph, the rights and obligations created by this Amended Stipulation shall terminate five years from date of execution. The termination of the Department's specific obligations under this Amended Stipulation shall not diminish or compromise the Department's obligation construed under the National Housing Act as amended, and Section 2 of the Housing Act of 1949 and Section 2 of the Housing and Urban Development Act of 1968 to provide foreclosure avoidance relief for mortgagors in temporary financial distress, and the Department shall provide assistance or relief in the form of the present assignment program or an equivalent substitute to permit mortgagors in default on their mortgages to avoid foreclosure and to retain their homes during periods of temporary financial distress.

*Accord, Ferrell v. Pierce*, 743 F.2d at 457–58.

In sum, HUD agreed to comply with the terms of its own Handbook for five years and further agreed to provide "foreclosure avoidance relief" subsequent to the five year period (after 1984) on terms no harsher for the mortgagor than those set out in the Handbook. Moreover, HUD consented to bind itself to follow the Handbook. *Ferrell v. Pierce. Accord, Federal Nat'l Mortgage Assoc. v. Rathgens*, 595 F.Supp. at 557 ("These guidelines are mandatory on HUD...."). *See also Armstead v. United States Dept. of Housing & Urban Dev.*, 815 F.2d 278, 282 (3d Cir.1987) (Handbook is relevant in deciding whether HUD properly refused to accept a mortgage assignment).

The assignment program set out in the Handbook,[8] and outlined in regulations, 24

---

gage as an appropriate defense to foreclosure in state court. *See, e.g., Fleet Real Estate Funding Corp. v. Smith*, 366 Pa.Super. 116, 530 A.2d 919 (1987).

**6.** This Handbook was offered into evidence as Ex. P–8.

**7.** The debtors have attempted to offer into evidence the entire consent decree by attaching a

copy to their posttrial submissions. As it was never properly offered into evidence, I have not reviewed that attachment.

**8.** HUD witnesses referred to a different Handbook, No. 4335.2, as providing guidelines for operating the mortgage assignment program after the assignment has been accepted. However, this Handbook was not offered into evi-

C.F.R. §§ 203.650 *et seq.* (1988), may be summarized as follows. Individuals facing foreclosure are informed of their right to request that HUD take an assignment of their mortgage. HUD then decides whether the mortgagor qualifies for an assignment by applying certain stated criteria. If an assignment is granted, HUD becomes the mortgage holder and affords the borrower up to 36 months of forbearance relief. During this forbearing period, the homeowners need not pay more than an established percentage (35%) of net income to HUD, taking into account relevant expenses. It is assumed that the borrower will then be able to tender a full mortgage payment, including escrows, at the conclusion of the forbearance period. Therefore, at the conclusion of the forbearance period HUD and the mortgagor establish a repayment program which requires at least full monthly mortgage payments. If the mortgagors' finances allow, greater than normal mortgage payments may be required. HUD, in turn, may extend the maturity date of the mortgage up to ten years in order to allow the homeowner to repay the mortgage loan in full. 24 C.F.R. §§ 2030.-650 *et seq.;* Handbook 4330.2 chapter 5, at 5-1 through 5-4. *See Ferrell v. Pierce; In re Zaidi,* 78 B.R. 410 (Bankr.E.D.Pa.1987).

Cases involving HUD mortgage assignments have almost exclusively discussed challenges by individual homeowners to HUD's decision not to accept an assignment of their mortgage. *See, e.g., Armstead v. United States Dept. of Housing & Urban Dev.; Miasel v. Pierce,* 650 F.Supp. 21 (D.Minn.1986); *In re Madison; In re Huderson,* 96 B.R. 541 (Bankr.E.D.Pa. 1989). Since the instant dispute involves issues arising after the assignment has been taken, such decisions are of limited assistance in resolving the debtors' objections. One decision, though, which examines the assignment program more broadly is *Ferrell v. Pierce.*

*Ferrell v. Pierce* concerned, in part, a challenge by the mortgagor parties to the consent decree mentioned above to HUD's

attempt to reduce or eliminate the assignment program. HUD desired to implement different "foreclosure avoidance relief" which would involve direct mortgage subsidy payments by HUD to lenders, and which was called TMAP ("Temporary Mortgage Assistance Payments"). These payments were to be considered loans to the mortgagor which must be repaid and which were secured by a second mortgage. Although the TMAP regulations were officially promulgated in the Federal Register in final form, 47 Fed.Reg. 33252–33258 (August 2, 1982), they have not yet been made effective. 24 C.F.R. §§ 203.640 *et seq.* (1988). Their implementation was successfully challenged in 1983 on the basis that the foreclosure avoidance benefits provided by TMAP were not as generous as those provided by the mortgage assignment program, as detailed in the Handbook, and therefore were violative of the consent decree, ¶ 14. *Ferrell v. Pierce,* 743 F.2d 454 (7th Cir.1984).

## IV.

The debtors cite to the district court *Ferrell* decision as supporting their position that HUD cannot accrue interest during the forbearance period. HUD argues that *Ferrell* is inapposite as it refers to the TMAP program, and that there is nothing in the forbearance agreement or mortgage agreement between HUD and these individual debtors which precludes the accrual of interest during this period. Indeed, as noted above, the forbearance agreements expressly stated that all rights under the note and mortgage were to remain unimpaired.

HUD is correct that *Ferrell* dealt with the TMAP program. The issue, though, was whether individual aspects of the TMAP program were less beneficial than the assignment program then in effect. If so, the 1979 consent decree precluded HUD from implementing a more restrictive program. On the issue of accruing interest

dence and I cannot determine whether its provisions are consistent with the terms of the con-

sent decree.

during forbearance periods, the *Ferrell* court stated:

> The plaintiffs' second attack on the above-quoted provisions of the proposed [TMAP] regulations concerns their alleged inconsistency with the current Handbook procedure of not charging interest on the amount of forbearance until after the period of reduced or suspended payments. *See* Handbook, Appendix 6. The proposed regulations provide that interest will begin to accrue on the amount of assistance payments or forbearance as of the dates thereof. HUD does not suggest that the plaintiffs have misstated the practice of forgiveness of interest under the current Handbook or misconstrued the intent and effect of the proposed regulations.
>
> The imposition of an additional interest obligation on assisted mortgagors—one that is not required and, in all probability, not contemplated by the amendments to section 230, *see* Section 230(a)(5) and (b)(2)—results in a more onerous payment burden for those assisted, more probability of future default and foreclosure, and may also limit eligibility for assistance because higher repayment obligations may preclude certain mortgagors from satisfying the "reasonable prospect" criterion. Therefore, insofar as [24 C.R.F.] §§ 203.633 and 203.649 require interest on assistance to accrue from the date of the assistance, those sections of the proposed regulations do not preserve basic rights under the Amended Stipulation and may not be implemented.

*Ferrell v. Pierce*, 560 F.Supp. at 1364–65, *aff'd*, 743 F.2d at 459. As a result of this decision, HUD amended its proposed TMAP regulation to reflect that interest does not begin to accrue on TMAP direct payments to lenders until the forbearance period ends. Proposed 24 C.F.R. § 203.644(a).[9]

TMAP was proposed as the functional equivalent of assignment, allowing HUD to avoid becoming the mortgagee and thus avoid paying the lender the full balance due on the mortgage. *Ferrell v. Pierce*, 743 F.2d at 458–59. The direct mortgage assistance payments made by HUD to the lender are thus to be viewed as equivalent to that portion of the monthly payment which the homeowner does not pay during the forbearance period after the mortgage is assigned. In 1983, the *Ferrell* court understood that interest did not accrue, on the forborne portion only, during the forbearance period. HUD has revised its TMAP repayment regulation accordingly.

Thus, despite the language of the forbearance contracts themselves, and pursuant to HUD's agreement in 1979, I conclude that a portion of the debtors' objection shall be sustained. That is, interest continues to accrue during the forbearance period but only to the extent that it does not exceed the homeowner's forbearance payments. If interest on the unpaid principal balance (plus loan advances, if such interest is permitted by the mortgage instrument) is less than the monthly forbearance payment, principal is reduced accordingly. If the interest is greater, the difference is forgiven—there is no negative amortization. However, interest does fully accrue once the forbearance period expires. Here, since the debtors paid all their forbearance period payments to HUD during their 36 month period, the principal balance due at the end of that period should have been the same as when the forbearance period started, except to the extent that escrow advances were made (as these advances may be added to the principal sum due).[10]

---

**9.** Pennsylvania has recently enacted a mortgage assistance program patterned on the HUD program called the Homeowner's Emergency Mortgage Assistance Program (HEMAP), 35 Pa.S.A. §§ 1680.401c *et seq.;* 16 Pa.Code §§ 40.201 *et seq.* Pa.Legislative Journal–House, June 29, 1983, at 929, 932 (remarks of Rep. Kokovich). HEMAP also treats its mortgage assistance payment as a loan upon which interest begins to accrue after the forbearance period expires. 35 Pa.S.A. § 1680.406c(5).

**10.** I recognize that the debtors did not pay timely all monthly payments due during the forbearance period. This defect is more than offset, though, by HUD's improper failure to credit monthly payments when received as opposed to when the payments, totaled together, reached a full normal mortgage payment. The mortgage

## V.

The second question presented flows from the debtors' proposed plan to cure their prepetition mortgage default pursuant to 11 U.S.C. § 1322(b)(5). HUD does not contest the debtors' right to cure but argues that "curing" this mortgage default requires the debtor to repay: all missed mortgage payments prior to assignment; that portion of the normal mortgage payment which was not required to be paid during the three year forbearance period; and all monthly prepetition mortgage payments that were due since the conclusion of the forbearance period. The debtors contend that only this last aspect of their delinquency need be cured. That is, they assert that chapter 13 allows them to bring current all missed payments due under the HUD assignment program which, in this instance, is only the regular mortgage payments due after the forbearance period ended—as they made all required forbearance payments.[11] In essence, HUD believes that it has already terminated these debtors from the assignment program, while the debtors contend that they are still entitled to benefit from that program.

Resolution of this question is made difficult by the origin of the assignment program (*viz.*, a consent decree), which offers little statutory or regulatory guidance—or even legislative history. Moreover, there are no reported decisions discussing the interplay of chapter 13 and the provisions of the HUD program. The parties correctly note that this is an issue of first impression.

█ In this circuit, a discussion of a chapter 13 cure must start with *Matter of Roach*, 824 F.2d 1370 (3d Cir.1987). In *Roach*, the Court of Appeals rejected the notion expressed by the Sixth Circuit in *In re Glenn*, 760 F.2d 1428 (6th Cir.1985), *cert. denied*, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985). The *Glenn* court had concluded that 11 U.S.C. § 1322(b)(3), (5) represented federal substantive rights which were to be interpreted uniformly, irrespective of state foreclosure law. The *Roach* court, following the principles expressed in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), concluded that the right to cure a mortgage default in chapter 13 is defined with reference to non-bankruptcy law, generally state law. *See also In re Brown*, 75 B.R. 1009 (Bankr.E.D.Pa.1987). Once non-bankruptcy law determines that the mortgage agreement itself is terminated, there is no federal right to resurrect the agreement through a bankruptcy filing. *Roach*, 824 F.2d at 1377–1379. *Compare In re Triangle Laboratories, Inc.*, 663 F.2d 463 (3d Cir.1981) (lease is unassumable in bankruptcy if it was terminated prepetition.)

The rights of the instant parties, at least insofar as the mortgage assignment program is concerned, are defined by federal non-bankruptcy law. It is that source which must be considered, with the focus being on the point at which the mortgagor's rights under the HUD assignment program terminate.

Unfortunately, neither the HUD regulations, the Handbook, nor decisional law address this issue. Clearly, though, a homeowner whose mortgage has been assigned to HUD has repayment obligations. The failure to comply with those obligations may result in foreclosure by HUD and the loss of the mortgagor's home. While those obligations are reflected in the annual repayment agreements signed by the mortgagors, Ex. G–8 and G–10, the mortgagors' rights and responsibilities are not defined solely by the contracts. For example, although the parties here did not enter into a repayment agreement after August 31, 1985, Ex. G–10, in November 1985 HUD was demanding immediate payment of only $3,988.40, which represented missed regu-

---

instrument itself does not permit the mortgagee's receipt of funds without crediting such funds; neither does the Handbook, nor the forbearance agreement.

**11.** The debtors assume that their prepetition, and postpetition, financial circumstances allow them to repay this HUD held mortgage at the lowest possible post-forbearance rate—i.e., a regular monthly mortgage payment. As will be discussed below, I am unable to pass upon the correctness of this assumption.

lar mortgage payments from October 1984 through November 1985.

■ HUD contends that it fully terminated the debtors' rights under its assignment program on December 2, 1985 when it sent a "Notice of Intention to Foreclose and Accelerate the Mortgage Balance," Ex. G–13, which notice demanded payment of $17,703.93. This communication must be contrasted with Ex. G–12 which was sent on November 12, 1985 and which demanded payment of only $3,988.43. Thus, HUD asserts that the debtors' right to cure the post assignment delinquency under chapter 13 ended with the issuance of Ex. G–13.

My difficulty with HUD's contention is twofold: first, *Roach* held that, under state law, a chapter 13 debtor may deaccelerate a mortgage after the lender had declared the entire balance due and owing prior to foreclosure judgment. 824 F.2d at 1374–77. Although no internal regulations were offered, HUD's witness testified that HUD policy afforded employees the discretion to deaccelerate a delinquency demand after a notice equivalent to Ex. G–13 had been sent. (Finding of fact # 27.) Accepting that testimony as true, the issuance of Ex. G–13 could not automatically terminate any rights of the debtors under the assignment program. *Compare In re DeSantis*, 66 B.R. 998, 1002–1003 (Bankr.E.D.Pa.1986) (although a lease terminated prepetition may not be assumed under 11 U.S.C. § 365, agreement of lessor may preserve lessee's right to cure and thus to assume).

Second, the premise behind HUD's various "foreclosure avoidance relief" mechanisms is a realization that low income homeowners with HUD insured mortgages will, by virtue of their economic status, find it proportionately more difficult to remain current under their mortgage agreements than other homeowners. *Ferrell v. Pierce*, 743 F.2d at 456. This difficulty does not end when the mortgage is granted; nor does it necessarily end when the assignment is granted. Consistent with the goal of decent and affordable housing for all is the recognition that if the mortgagor can repay HUD all missed prepetition payments under the assignment program and remain current on requisite postpetition payments, both HUD and the homeowner benefit. HUD's benefit stems from avoiding the costs associated with foreclosing, as well as owning property often left vacant and vandalized. *See Ferrell v. Pierce*, 743 F.2d at 458. The mortgagor benefits by retaining decent housing.

This policy is better realized by concluding that the mortgagor's assignment program rights are irrevocably lost later rather than earlier in the foreclosure process. Exactly where in the process this would occur I need not decide; I need only conclude, as did HUD's own witness, that the loss of rights does not occur with the first acceleration notice.

As HUD took no further steps toward foreclosure prepetition after sending Ex. G–13, the debtors' rights under § 1322(b)(5) remain. Thus, the debtors' objection to HUD's proof of claim shall be sustained.

### VI.

A complete resolution of this dispute would determine precisely HUD's allowed secured claim as well as the prepetition arrearage under the assignment program which must be paid under any plan proposed under § 1322(b)(5). *See* local Bankr. R. 3001.1(b). Unfortunately, the record presented is insufficient for me to make such determinations with any precision. I shall do so only by approximation.

The debtors filed their chapter 13 petition in July 1987, and their forbearance period ended October 1, 1983. HUD agrees that all forbearance payments were made. The first annual repayment agreement beginning September 1, 1983 called for monthly payments of $295.00 (which included escrows for taxes and insurance). Ex. G–8. The second annual repayment agreement through August 1985 called for the same payments. HUD, in its proof of claim, stated that it paid $6,038.35 in real estate taxes prepetition on the debtors' behalf and the debtors do not challenge this assertion. Principal and interest due under the original mortgage agreement total $220.17 per month.

Assuming that the taxes paid represent all prepetition taxes due from the date of assignment, October 1, 1980, through the bankruptcy filing, July 1987, and assuming that there were no advances made for insurance, then the debtors would have me conclude that the amount needed to cure this assignment delinquency was $15,808.12.[12] This figure contains a significant assumption which may be correct. The debtors assume that the monthly payments to be made by them in the time between the end of the forbearance period and the commencement of this bankruptcy case were the minimum required—normal monthly mortgage payments. However, depending upon the debtors' financial circumstances, larger than normal payments may have been required.

It is for the agency, HUD, to analyze the mortgagors' financial condition in the first instance and determine the appropriate repayment terms. *Cf. In re Huderson* (bankruptcy court remands to HUD dispute over whether mortgage assignment should be granted). Certainly, HUD determined that the minimum payments were appropriate though September 30, 1985. Ex. G–8, G–10. I have no basis, though, to decide whether such minimum payments should continue through July 1987. As HUD never made such a determination, it will be given thirty days within which to do so and file an amended proof of claim.

Similarly, the debtors assume that postpetition mortgage payments due in accordance with 11 U.S.C. § 1322(b)(5) are also the minimum permitted under the assignment program—the normal mortgage payment escrows for taxes and insurance. Again, HUD must determine initially whether this assumption is correct by reviewing the debtors' current financial circumstances. It will have thirty days to do so.[13]

The allowed secured claim submitted by HUD, Ex. G–18, is derived from an analysis set out in Ex. G–17. Of that sum claimed, $7316.00 represents interest improperly accrued on principal during the three year forbearance period.[14] The sum of $404.04 represents improperly accrued service charges during this same period. Approximately $300.00 of the interest on the taxes paid during this period would also be improper. Thus, the approximate allowed secured claim would be $42,478.87. HUD will have thirty days to amend its proof of claim and recalculate figures.

An appropriate order shall be entered.

### ORDER

AND NOW, this 13th day of March, 1989, for the reasons set forth in the accompanying Opinion, it is hereby ORDERED that judgment is entered in favor of the debtors and against HUD on Counts I and III of the complaint.

It is further ORDERED that the proof of claim filed on September 18, 1987 by HUD stating that a prepetition arrearage existed in the amount of $25,110.88 and asserting an allowed secured claim of $50,499.01 is disallowed. HUD shall have thirty days to file an amended proof of claim consistent with the accompanying Opinion.

It is FURTHER ORDERED that, upon the debtors' payment of the prepetition mortgage assignment arrearage and maintenance of postpetition payments due under the terms of their plan pursuant to 11 U.S.C. § 1322(b)(5), the debtors' rights under the HUD mortgage assignment program are reinstated.

---

**12.** The arrearage is calculated as follows: payments of principal and interest between October 1, 1983 and July 7, 1987, plus repayment of taxes paid, plus service charge of $384.01, less $948.50 repaid after October 1983. There is no need to reimburse HUD for insurance since there were no insurance outlays.

**13.** If the debtors are uncooperative, which seems unlikely, HUD may consider utilizing Bankr.R. 2004.

**14.** This is calculated on an unpaid principal balance of $27,078.30 at time of assignment at 9% interest, as set forth in Ex. G–20.