**In re Emma ALLEN, Debtor.**

**Emma ALLEN, Plaintiff,**

**v.**

**PHILADELPHIA ELECTRIC COMPANY and Leo Doyle, Esquire, Trustee, Defendants.**

**Bankruptcy No. 85–05282K. Adv. No. 86–1346S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 10, 1987.

tion, and (2) fair, equitable and orderly treatment of creditors—are not served by abstaining in this matter.

Jeffrey M. Edelson, Michael Donahue, Chester, Pa., for debtor/plaintiff.

T.H. Maher Cornell, Philadelphia Electric Company, Philadelphia, Pa., for defendant/Philadelphia Electric Company.

Leo F. Doyle, Philadelphia, Pa., trustee/defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This adversarial proceeding, arising in a factual setting containing several unique aspects, presents, at its core, a rather straightforward issue of the inter-relationship between two (2) Code sections, 11 U.S.C. § 348, pertaining to the effect of the conversion of a case from one chapter to another, and 11 U.S.C. § 366, pertaining to the rights and obligations of Debtors seeking to retain utility service after filing bankruptcy. We hold that the phrase "after the date of the order for relief" in 11 U.S.C. § 366(b), pertinent to when adequate assurance of payments may be required to retain service, refers to the date that a bankruptcy petition is originally filed, and not to the date of conversion if the case is ultimately converted. This being so, the articulated policy of the utility company here to request a new, full additional assurance of payment from a customer at the time of conversion without court sanction is contrary to 11 U.S.C. § 366(b), and cannot be permitted to be applied to any debtor, including the Debtor here. Therefore, we must grant the Debtor her requested relief declaring that the Defendant cannot demand a second measure of adequate assurance of payment to retain service upon the conversion of her bankruptcy case from a proceeding under Chapter 13 of Title 11, U.S.Code, to one under Chapter 7, and order the utility company to continue to provide service to her without requiring the Debtor to make such a payment.

The Debtor, identifying herself as "Emma Allen, Social Security No. 191–38–0236, 1517 Noblet Avenue, Sharon Hill, Delaware County, PA 19079," commenced this bankruptcy case under Chapter 13 of title 11, U.S.Code, on December 9, 1985.

On April 24, 1986, the Standing Chapter 13 Trustee, James J. O'Connell, Esquire, filed a Motion to Dismiss the case on the grounds that the Debtor had failed to appear at the meeting required by 11 U.S.C. § 341, scheduled to be held the previous day, and because she had failed to make payments per her Plan. On May 20, 1986, this Motion was granted, and her case was dismissed by Order of our precedessor, the Honorable William A. King, Jr.

On July 17, 1986, a Motion to vacate the dismissal Order and reinstate the case was filed and, on August 12, 1986, this Motion was granted by Order of Chief Judge Emil F. Goldhaber, stating that "the Order of May 20, 1986, dismissing the ... matter is hereby vacated."

On September 24, 1986, the Debtor filed a Praecipe to convert this case from a proceeding pursuant to Chapter 13 to one pursuant to Chapter 7. Per 11 U.S.C. § 1307(a), which provides that a debtor has a non-waivable right to effect such a conversion at any time, this Court, on September 25, 1986, ordered the matter converted.

Ultimately, Defendant LEO F. DOYLE, ESQUIRE, who has not appeared in the proceeding, was named as Interim Trustee.

On November 14, 1986, the Debtor initiated this adversarial proceeding, filing, at the same time, a Motion for an expedited hearing and a request, in the nature of a temporary restraining order, directing that Defendant, PHILADELPHIA ELECTRIC CO. (hereinafter referred to as "PECO"), refrain from terminating her electric and gas service until a hearing could be scheduled in the proceeding. Upon the representation by the Debtor's counsel that such an Order was unopposed on an interim basis, we entered an Order on November 14, 1986, granting this relief and scheduling a hearing on the matter on November 25, 1986.

On this latter date, a hearing was indeed conducted. On November 26, 1986, we entered an Order, revised to correct erroneous wording in one paragraph on December 1, 1986, which allowed PECO to supplement the record by adding thereto a copy of the Debtor's Application for a Low Assistance Home Energy Assistance Payment (hereinafter referred to as "LIHEAP") "crisis assistance" payment, and requesting the parties to file Briefs on or before December 19, 1986 (the Debtor), and January 9, 1987 (PECO).

Because testimony was adduced on November 25, 1986, from James T. Wyatt, PECO's Credit Supervisor, and Michael Donahue, Esquire, co-counsel for the Debtor, and several factual findings are pertinent to the disposition of the case, we are rendering our Opinion in the form of Findings of Fact, Conclusions of Law, and Discussion, per Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

1. On March 7, 1985, PECO opened an account in the name of "Emalue Allen, 1517 Noblet Avenue, Sharon Hill, PA 19079." [1]

2. As of the date that the Debtor filed her bankruptcy case, on December 9, 1985, PECO's records revealed that "Emalue Allen" had a delinquency balance of $1,552.69.

3. On December 10, 1985, Mr. Donahue directed a letter to PECO's Chester office on behalf of the Debtor, enclosing a time-stamped copy of the first page of the bankruptcy petition, setting forth the Debtor's name and address and requesting that PECO make no further attempts to collect pre-petition debts; that service be restored if it had been terminated; and that Ms. Allen be billed for all future usage.

4. The Debtor was receiving electric and gas service from PECO at the time of receipt of the letter.

5. Upon receipt of other letters similar to the foregoing relating to other bankruptcy debtors, the policy of PECO is to "final out" the old account, open a new account with a new number, and advise the customer-debtor of the sum required to constitute adequate assurance of payment, per 11 U.S.C. § 366(b), which is usually one-sixth the average annual bill of the customer-Debtor (approximately two (2) months' annualized usage).

6. In this instance, because PECO had no account in the name of "Emma Allen," although it did have an account in the name of "Emalue Allen" at the same address, it took no action.

7. There was no communication from PECO to either the Debtor or her counsel indicating that no "Emma Allen" account had been located, nor was there any inquiry from the Debtor or her counsel as to whether "Emma Allen" and "Emalue Allen," residing at the same address, were

---

**1.** In its Brief, PECO makes several references to its purported records indicating that the Social Security No. of this applicant is 191–38–2523, which differs from that of the Debtor. The Debtor accurately pointed out, in an unsolicited Reply Brief, that there was no reference to any discrepancy in the Debtor's Social Security number in the record. In addition to being a factor which, not being part of the record, we cannot consider, this alleged discrepancy is irrelevant in any event to our disposition.

the same person, or what the relationship of any such two (2) persons was.

8. On the other hand, neither Mr. Donahue, nor the Debtor, who received a copy of it, followed up the letter of December 10, 1985, to determine why no sum for adequate assurance of payment has been provided to the Debtor by PECO.

9. On May 14, 1986, the Debtor's utility service was terminated.

10. On the same day, May 14, 1986, the Debtor, identifying herself as "Emma Allen" and utilizing the Social Security number on her Petition, did apply for a LIHEAP crisis grant in the amount of $300.00 from the Delaware County Board of Assistance, and it was approved that day.

11. Shortly thereafter, Mr. Donahue called PECO's Chester office; advised a Ms. Lobb of that office that the Debtor had filed a bankruptcy; and reached an agreement with Ms. Lobb that the Debtor's service would be restored when PECO received an adequate assurance payment of $385.00, consisting of $300.00 from a LIHEAP crisis grant and an $85.00 payment from the Debtor's own funds.

12. The dismissal of the Debtor's case took place shortly after this conversation. PECO was not advised by Mr. Donahue, and hence was completely unaware, that the Debtor's bankruptcy case had ever been dismissed.[2] However, since it had been concluded, in December, that it could not act on Mr. Donahue's letter of December 10, 1985, because it had no record of the customer designated therein, this fact did not affect PECO's course of action, which was to act, at that time, as if the case had recently been filed.

13. On June 4, 1986, PECO sent a letter to the Debtor indicating that a payment of $390.00 was required as adequate assurance of payment, on or before June 23, 1986.

14. By June 6, 1986, PECO received both the $300.00 LIHEAP grant payment and $85.00 in cash from the Debtor. Therefore, on that date it opened a new account and restored her service. The payment of $385.00 of the $390.00 figure cited in the June 4, 1986 letter; the fact that Ms. Lobb had earlier cited a figure of $385.00 for adequate assurance; and the action of PECO in restoring the Debtor's service upon receipt of the $385.00 represent acceptance by PECO of this sum as adequate assurance of payment at that time, per 11 U.S.C. § 366(b).

15. The Debtor accumulated an additional bill of $1,807.35 between December 9, 1985, and September 24, 1986, the date on which she sought to convert her case to a Chapter 7 case. Since September 24, 1986, an additional bill in the amount of $161.47 was issued. There is no evidence of any payments on any of these bills by the Debtor since December 9, 1985, except for the $385.00 sum of payments recited in paragraph 14 *supra.*

16. On September 23, 1986, Jeffrey M. Edelson, Esquire, who practices in the same firm as Mr. Donahue, sent a letter to PECO's Chester office advising of the conversion of the Debtor's bankruptcy to a Chapter 7 case, and stating that, therefore, no efforts should be made by PECO to collect bills arising prior to September 24, 1986.

17. On September 29, 1986, and October 1, 1986, respectively, Mr. Edelson had a telephone conversation with, and sent a further letter to, a Ms. Key in PECO's main, Philadelphia office, advising that he believed that no further assurance of payment, per 11 U.S.C. § 366(b), was required of the Debtor to continue her service. In the telephone conversation, Ms. Key expressed an opinion to the contrary and

---

**2.** There is some question in our minds as to whether Mr. Donahue may have, at least unintentionally, misled PECO by not advising Ms. Lobb that the Debtor's bankruptcy had been recently filed or that dismissal of the case was scheduled, or by not advising her or any other PECO employee that the case had in fact been dismissed shortly thereafter. However, this factor is not significant in light of our other findings and disposition of this matter, and we need not dwell on it.

hence, in the letter, Mr. Edelson not only enclosed the Praecipe to Convert the case from Chapter 13 to Chapter 7, but noted that insistence on another payment for assurance would result in the Debtor's filing a complaint in bankruptcy court.

18. On October 1, 1986, Mr. Wyatt directed a letter to the Debtor, copy to Mr. Donahue, requesting that an additional payment of $460.00 be made on or before October 21, 1986, as adequate assurance of payment, or, if payments were not paid, advising that service would be terminated.

19. At the time of dispatching this letter, Mr. Wyatt was fully aware that the Debtor's case had been converted from Chapter 13 to Chapter 7, but he was effecting a PECO policy that an additional, full adequate assurance of payment must be produced if a debtor who converts a bankruptcy from a Chapter 13 case to a Chapter 7 case desires to retain service, unless the debtor has remained current on all payments since the filing of the original Chapter 13 case.

20. Since the Debtor here had not remained current on her payments subsequent to her bankruptcy filing on December 9, 1985, the policy of PECO, as applied to the Debtor, was to unilaterally demand that she make an additional, full adequate assurance payment to retain service.

## CONCLUSIONS OF LAW

1. Adequate assurance of payment can be requested by a utility at only one time in a bankruptcy case, even if the case is converted from Chapter 13 to Chapter 7, per 11 U.S.C. §§ 348(a), 348(b), and 366(b).

2. The policy of PECO, as set forth in Findings of Fact 19 and 20, *supra*, both generally and as applied to the Debtor, is

contrary to the terms of the aforementioned sections of the Bankruptcy Code, and hence cannot be legally effected in this or any other bankruptcy case.

3. The Debtor is entitled to the relief sought in her Complaint, *i.e.*, a declaration that this policy is illegal and an Order precluding PECO from demanding, without court approval, another adequate assurance of payment in addition to the sum of $385.00 accepted by PECO as such adequate assurance of payment from the Debtor on or about June 6, 1986, as a condition to retention of service.

## DISCUSSION

As we indicated at the outset, this proceeding embraces several truly unique aspects, which tend to deflect attention from the rather simple decisive aspect of the interplay of 11 U.S.C. §§ 348(a) and (b) and § 366(b) which is at its core. These unique elements shall be discussed first, and their ultimate insignificance emphasized at the outset.

First, PECO raised and vigorously pressed an issue as to whether the Debtor and its customer were the same person, insisting that its customer (or former customer), Emalue Allen, and the Debtor, Emma Allen, may not have been one and the same person.

While an aura of mystery pervades Ms. Allen, which her failure to appear at the hearing continued to perpetrate, we do not believe that this issue is relevant to our determination. We note that PECO approached the identity question with the mindset of a computer, failing to consider that an "Emalue Allen" and an "Emma Allen" living at the same address could at least possibly be one and the same person.[3]

3. It may be natural to assume that the Debtor has a child or another relative by the name of Emma (or Emalue) living with her and that this caused the confusion. However, it is equally possible to have persons living together with the *same name* (a senior and a junior) at the same address, and this set of circumstances presumably would not have resulted in a similar reaction by PECO. Further, we note that the Debtor's schedules identify seven (7) dependent children residing with her named Desiree, Karen, Hope, Rashiba, Libya, Pamela, and Mary—but no Emma or Emalue or any variant thereof. No other relative living with the family was identified and it would seem unlikely that a single parent having so many dependent children would take in another relative. Of course, it is not impossible that "Emalue Allen" is an imaginary personage concocted by the Debtor just to obtain free utility service. We cannot

At least an inquiry of PECO to the Debtor or her counsel on this point would have seemed to have been in order.

However, by the time of her LIHEAP Application on May 14, 1986, the customer at 1517 Noblet Avenue, Sharon Hill, was clearly identified as the Debtor, Emma Allen. Service was restored to "Emma Allen" on June 6, 1986. It is the only interaction between the Debtor and PECO after June 6, 1986, which is relevant to the disposition of the instant matter. Hence, the "identity crisis" concerning Ms. Allen was resolved before the pertinent facts came to pass.[4]

Secondly, the hiatus created by the dismissal of the bankruptcy case which transpired, ironically, during the very time of the Debtor's adequate assurance payment and restoration of service, raises some potential questions as to the efficacy of those acts in light of the status of the bankruptcy. If the Dismissal Order had not been undone by the later Order vacating it, the negotiations of Mr. Donahue with the PECO personnel and the Debtor's subsequent payments in accordance with those negotiations would have constituted totally meaningless actions.

■ However, we believe that the Order of August 12, 1986, which expressly "vacated" the Dismissal Order of May 20, 1986, had the effect of rendering the May 20th Order utterly and entirely void. Oddly enough, given its overly-abundant use in this Court,[5] we could not locate any authority addressing the legal effect of the "vacating" of a prior order of dismissal. We were therefore forced to turn to BLACK'S LAW DICTIONARY 1388 (5th ed. 1979), which defines "vacate" as "To annul; to set aside; to cancel or rescind. To render an act void; as, to vacate an entry of record, or a judgment." Therefore, at least in circumstances where the Debtor is not estopped because of a change of position by another party to its detriment in reliance of the dismissal, we are inclined to treat the "vacated" dismissal order as if it were totally null and void and never existed.[6]

This reasoning causes us, here, to conclude that the fact that the Debtor's bankruptcy was dismissed on May 20, 1986, is entirely irrelevant. As we stated in Finding of Fact 11, PECO did not act to its detriment in reliance of the dismissal, being apparently unaware of its existence. Hence, there is no impediment to concluding, as we do, that the May 20, 1986, Dismissal Order can be disregarded entirely in our disposition of this matter.

Finally, we refuse to deem significant the following two (2) legal issues raised by PECO: (1) Was the LIHEAP grant properly credited to the adequate assurance payment rather than to the prior debt in the Debtor's open account? (2) Should injunctive relief be barred by the Debtor's purported lack of good faith?

attribute this to the Debtor, however, without some evidence thereof.

4. In fact, if PECO really believes that there is a separate person named "Emalue Allen" that was its customer prior to June 6, 1986, it would be impossible for PECO to attempt to terminate the service of the Debtor for bills "furnished in the name ... of persons other than the ratepayer." 52 PA.CODE § 56.83(8).

5. We believe that the power to vacate orders should be employed sparingly, and only in those narrow situations spelled out in Bankruptcy Rule (hereinafter referred to as "B.Rule") 9023 and Federal Rule of Civil Procedure (hereinafter referred to as "F.R.Civ.P.") 59(e), and in B.Rule 9024 and F.R.Civ.P. 60. We prefer having cases once dismissed ended and allowing such orders to be vacated to be confined to truly extraordinary circumstances. This policy is tempered by our narrow reading of 11 U.S.C. § 109(f), thus permitting new filings by Debtors whose cases have been dismissed unless they fall within the strict confines of 11 U.S.C. § 109(f).

6. In light of the foregoing and in the interests of assisting PECO in formulating its policies in grey areas in the future, we now feel prepared to comment on Mr. Wyatt's statement, in response to the Court's questioning, that it is PECO's policy to require a new adequate assurance of payment if a case is dismissed and the dismissal order is subsequently vacated. As an order vacating a dismissal order renders the dismissal order a complete nullity, a request for an additional assurance of payment, per 11 U.S.C. § 366(b), would not be in order.

■ In support of the first principle, PECO cites the unreported decision of our predecessor, Judge King, in *In re Adams*, Bankr. No. 83–04565K, Adv. No. 84–0078K (Opinion filed June 24, 1986), holding that LIHEAP payments are not property of the Debtor's estate and presumably were held to leap directly from the Department of Public Welfare to PECO. In view of *Morris v. Philadelphia Elec. Co.*, 45 B.R. 350 (E.D.Pa.1984); *In re Maya*, 8 B.R. 202 (Bankr.E.D.Pa.1981); and the quite obvious misreading of the significance of 42 U.S.C. § 8624(f) in *Adams*, we believe that the *Adams* decision was erroneous. Further, we note that, during the pendency of the briefing in this case, the *Adams* decision was reversed by a decision of the Honorable Anthony J. Scirica of the District Court in a decision involving four (4) related cases, including *Adams*, in *McCauley v. Philadelphia Elec. Co.*, C.A. Nos. 86–4415 to 86–4418 (E.D.Pa., Opinion filed Jan. 7, 1987). We believe that, clearly, a LIHEAP crisis grant on which payment is remitted to the utility after a bankruptcy filing must be credited to a Debtor's post-petition utility obligations. There is no reason why a LIHEAP grant could not and should not be credited to the § 366(b) adequate assurance payment as an alternative to its being credited to post-petition bills of the Debtor if the Debtor so chooses.

In any event, this factor is rendered a nonissue here by the unrebutted testimony of Mr. Donahue that Ms. Lobb of PECO agreed to accept the LIHEAP grant of $300.00 as a portion of the Debtor's adequate assurance remittance. Moreover, PECO acted on this agreement by restoring the Debtor's service in consideration for the remittance of $385.00, most of which came from the $300.00 LIHEAP grant. It is therefore difficult to understand how, even if Judge King's decision in *Adams* were intact, PECO could argue that, under these circumstances, the Debtor's LIHEAP grant should not have been credited to the Debtor's adequate assurance payment.

There are two (2) answers to PECO's argument that relief should be denied to the Debtor in light of her purported lack of good faith, which appears to arise from the Debtor's concededly poor payment record and the aforementioned question regarding her identity. First, this Court cannot countenance a violation of any of the Code's protections of debtors by a creditor, irrespective of the Debtor's history of irresponsible financial management. Most debtors are led to the bankruptcy court by some measure of poor financial management and, by definition, they are persons who have not paid bills. Secondly, we cannot lightly attribute lack of good faith to an indigent single parent supporting seven (7) dependent children on a welfare grant who appears to be unable, as opposed to unwilling, to pay for such an obvious necessity as utility service. Greatly inflated utility costs in the face of relatively stable welfare grants create a crisis atmosphere for persons situated like the Debtor, and such a crisis could make even the most honest person devious in his or her means to obtain such a necessary commodity. In any event, there is no evidence on the record here that the Debtor here did in fact do anything devious or dishonest. *See* page 871 n. 3 *supra*.

Having disposed of all of the issues which the parties have addressed that we do not consider significant to the resolution of this matter, we are now prepared to address those which we do deem relevant. At the outset, we set forth the pertinent Code sections, 11 U.S.C. §§ 348 and 366, in the form that they existed [7] prior to the 1986 amendments:

Sec. 348. Effect of conversion.

(a) Conversion of a case from a case under one chapter of this title to a case under another chapter of this title constitutes an order for relief under the chap-

---

**7.** It is the form of these Code sections as they existed prior to the 1986 amendments which are applicable to this case. The only changes effected by these amendments to these sections are additional references to comparable sections in the new Chapter 12.

ter to which the case is converted, *but, except as provided in subsections (b) and (c) of this section, does not effect a change in* the date of the filing of the petition, the commencement of the case, or *the order for relief.*

(b) Unless the court for cause orders otherwise, in sections 701(a), 727(a)(10), 727(b), 728(a), 728(b), 1102(a), 1110(a)(1), 1121(b), 1121(c), 1141(d)(4), 1146(a), 1146(b), 1301(a), 1305(a), and 1328(a) of this title, "the order for relief under this chapter" in a chapter to which a case has been converted under section 706, 1112, or 1307 of this title means the conversion of such case in such chapter.

(c) Sections 342 and 365(d) of this title apply in a case that has been converted under section 706, 1112, or 1307 of this title, as if the conversion order were the order for relief.

(d) A claim against the estate of the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112 or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

(e) Conversion of a case under section 706, 1112, or 1307 of this title terminates the service of any trustee or examiner that is serving in the case before such conversion. (emphasis added).

Sec. 366. Utility service.

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, *within 20 days after the date of the order for relief,* furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment. (emphasis added).

Section 366(a) states that a utility may decline to provide service only under the terms set forth in § 366(b). The latter provision states that the utility may decline to provide service only if "neither the trustee, nor the debtor *within 20 days after the order for relief,* furnishes adequate assurance of payment, ..." (emphasis added).

█ A threshold consideration not raised by PECO is whether § 366(b) comes into play at all because the Debtor admittedly did not provide the requisite adequate assurance within twenty (20) days after she obtained the order for relief, *i.e.*, within twenty (20) days from December 9, 1985. Rather, the adequate assurance payments were not made until June 6, 1986. However, we do not read § 366(b) as allowing the Debtor one-time chance, within twenty (20) days of a filing, to make the assurance payment, and then rendering it impossible for a debtor to ever reacquire utility service under the terms of § 366(b) if payment is made thereafter. Rather, we read it as allowing the Debtor to submit the adequate assurance payment at any time after the order for relief, and thereupon receive utility service, at least from the date of payment forward.

It is true that failure to provide the adequate assurance payment within the 20–day period renders a Debtor susceptible to a service termination. This was a lesson learned by the Debtor here, whose service was terminated, and not in any sense contrary to Code requirements, by PECO on May 14, 1986, since five (5) months had elapsed after the date of filing without a payment.

However, as proven by the fact that it did restore the Debtor's service after she made the adequate assurance payment, PECO recognized and properly acted upon its duty to restore service to the Debtor

upon payment, even though the 20–day period had elapsed.

We believe that the crucial issue in resolving this matter is interpretation of the phrase "after the order for relief" in § 366(b). The determinative question, in our view, is whether the phrase refers to the date of the filing of the original petition or the date of conversion or, as PECO apparently argues, both. The answer to this question is found in §§ 348(a) and (b).

First, § 348(a) provides that, "except as provided in subsections (b) and (c) of this section," conversion does *not* effect a change "in the date of ... the order for relief." Next, §§ 348(b) and (c) recite a number of sections in which the phrase "the order for relief" means the date of conversion. Section 366(b) is not among those enumerated Code sections. We conclude, with Collier, that "[t]herefore, other than the noted exceptions, those provisions of the Code which are keyed to the date of the entry of the Order for relief for their operation are unaffected in this respect by conversion." 2 COLLIER ON BANKRUPTCY, ¶ 348.02, at 348–5 (15th ed. 1986). The date of the order for relief is therefore established by § 348(a) as the date of the filing of the original petition.

Applied to the instant factual setting, we conclude that the adequate assurance payment by the Debtor on June 6, 1986, constituted the requisite furnishing of the assurance after the order for relief, per § 366(b). From the foregoing analysis of § 348(a), we conclude that the argument that the conversion effects another order for relief, justifying another demand for a full assurance payment, is incorrect. We therefore conclude that the Debtor must prevail on the issue before us.

We do note some equities in favor of PECO. First, this is an issue, of, apparently, first impression. We believe that the goal of PECO, as expressed by Mr. Wyatt and indicated by PECO's counsel in agreeing to allow the Debtor to retain service pending our disposition here, is to establish policies which are both consistent with the Code and humane. We are confident that, now that this issue is resolved, PECO will amend its policies accordingly. Secondly, in § 348(d), it is made clear that additional claims by PECO for services rendered between the date of filing and the date of conversion are "treated for all purposes as if" the claims had arisen pre-petition. In the instant factual matrix, this means that claims for services provided between December 9, 1985, and September 24, 1986, are treated exactly like claims arising before December 9, 1985, *i.e.*, they will, in all probability, be discharged. This does provide an incentive to debtors to initially file under Chapter 13 and convert later where they are faced with post-petition obligations. Of course, it may constitute fraud for a Debtor to incur a debt knowing that he or she will later convert and that the obligation will be subject to discharge. However, no fraud has been established here. It thus appears that the Debtor has merely taken advantage of an extra dispensation to the converting debtor which is specifically allowed by the Code. Since Section 348(d) appears directly after the provisions of 11 U.S.C. §§ 348(b) and (c), can only conclude that Congress understood completely what it was doing in providing this dispensation to converting debtors and meant to do so as to the debtor taking advantage of it.

We also believe that PECO is not entirely helpless in this situation. We see nothing to preclude a utility from requesting a modification of an earlier adequate assurance of payment if changed circumstances, such as an increase in usage between the date of filing and the date of conversion, or negative consequences flowing from the fact of the conversion itself, have intervened. *See In re Marion Steel Co.*, 35 B.R. 188, 197 (Bankr.N.D.Ohio 1983). Certainly, if PECO made a request to the court to increase the requisite adequate assurance payment in the amount of $75.00 from $385.00 to $460.00, apparently the appropriate figure as of September, 1986, or even some higher figure in light of the conversion and intervening lack of payment, this Court might be receptive to such a request. However, PECO did not proceed in this fashion, but sought, here, to terminate service without recourse to this Court, unless

an additional $460.00 figure was paid. This, we believe, is contrary to the requirements of the Code, which mandate that, once the original adequate assurance payment has been made after the date of the order for relief, no further assurance payment may be demanded as a condition for future service without recourse to the Court.

Further, we note that PECO has a powerful remedy when the Debtor, even after being granted the dispensations arising from her conversions, will not or cannot, and therefore does not, pay her post-conversion bills. As the Third Circuit Court of Appeals states in *Begley v. Philadelphia Elec. Co.,* 760 F.2d 46, 51 (3d Cir.1985), "[i]f, after establishment of an adequate assurance amount the debtor defaults on subsequent payments, the provisions of 52 Pa.Code, Chapter 56 come into play and the utility may seek to disconnect service as its remedy for non-payment" without "further recourse to the bankruptcy court." *But see Marion Steel Co., supra,* at 199–200 (unilateral right of utility to shut off service upon post-assurance default denied without at least an expedited prior hearing in the bankruptcy court).

An Order consistent with our aforementioned Conclusions will be entered.