In re Emilio J. SCIORTINO, Debtor.

Emilio J. SCIORTINO and Dorothy M. Sciortino, Plaintiffs,

v.

MORTGAGE DEFAULT SERVICES, INC. and Edward Sparkman, Esquire, Chapter 13 Trustee, Defendants.

Bankruptcy No. 89–14694S.
Adv. No. 90–0617S.

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 24, 1990.

Philip A. Bertocci, Community Legal Services, Inc., Philadelphia, Pa., for debtor and plaintiffs.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Gary McCafferty, Philadelphia, Pa., for defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding prompts this court to consider, for the first time, the scope of a proof of claim filed by an assignee of a mortgage which had, in the past, been assigned to the United States Department of Housing and Urban Development ("HUD") after HUD had accepted the mortgage in its Mortgage Assignment Program, established in 12 U.S.C. § 1715u(b) ("the MAP"). Fortunately, much of the difficult path of analysis of such matters has been cleared by thoughtful decisions of our district court in a proceeding in which the reference to this court was withdrawn, *In re Epps*, 110 B.R. 691 (E.D.Pa.1990), and of our colleague, the Honorable Bruce Fox, in *In re Santos*, 97 B.R. 227 (Bankr.E.D.Pa.1989).

We reject the Claimant's contention that *Epps* and *Santos* err in their unanimous conclusion that the modification of the rights of a mortgagor who has been accepted into the MAP do not terminate when the initial 36–month period of forbearance provided under the MAP ends. We concur with the formula for computation of the principal and interest set forth by Judge

Fox in the reported *Santos* decision and a subsequent unreported Memorandum of May 19, 1989, in that case. We agree with the holding of *Epps* that the date of termination of the mortgagor's rights under the MAP is no sooner than the date of a foreclosure judgment, although we believe that the pertinent HUD Handbook and possibly pertinent state law suggest that the termination date should be no earlier than one hour before a sheriff's sale scheduled to execute upon any foreclosure judgment.

We apply these principles to only the Husband–Debtor in the instant proceeding, despite the joinder of the Debtor's non-debtor Wife as a plaintiff herein, because we do not believe that we have jurisdiction to adjudicate the Wife's rights. We fix the proof of claim for arrearages due to the Claimant as to the Debtor at the sum of payments not abated by the MAP ($6,333.44), plus an undisputed escrow deficit and late charges of $523.61, plus a reasonable attorney's fee of $300 and costs of $510.50, *i.e.*, at $7,667.55. We also declare that the interest to which the Claimant is entitled on the full balance of the mortgage in issue is limited to $6,341.23, due to the Debtor's participation in the MAP.

## B. PROCEDURAL HISTORY

The instant proceeding was filed on July 19, 1990, by the Debtor, EMILIO J. SCIOR- TINO ("the Debtor"), and DOROTHY M. SCIORTINO, the Debtor's wife ("the Wife"), against MORTGAGE DEFAULT SERVICES, INC., the assignee from HUD of a mortgage of the Debtor and the Wife (collectively "the Mortgagors") under a contract to provide servicing of mortgages assigned to HUD under the MAP ("the Claimant"); [1] and EDWARD SPARKMAN, the Standing Chapter 13 Trustee, named as a nominal defendant. The instant proceeding was preceded by a proceeding decided by an Opinion of this court of May 24, 1990, reported as *In re Sciortino*, 114 B.R. 423 (*"Sciortino I"*). In that Opinion and an accompanying Order, addressing a state-court foreclosure proceeding removed to this court by the Debtor, we vacated a foreclosure judgment as to the Debtor only, mainly on the ground that the pre-judgment notice of intention to foreclose sent to the Mortgagors pursuant to 41 P.S. § 403(c) of Act 6 of 1974, 41 P.S. § 101, *et seq.* ("Act 6"), was defective. *Id.* at 428–30. At the close of that decision, we relegated the establishment of the foreclosure plaintiff's rights to the bankruptcy claims process. *Id.* at 429. The instant proceeding is an outgrowth of that claims process.

This Complaint filed in this proceeding attacks a proof of claim filed by the Claimant on July 13, 1990, reciting as follows:

Listed below are the arrearages as of 12/1/89

| | | |
|---|---:|---:|
| Principal | $ 1,085.28 | |
| Interest | 10,253.18 | |
| Escrow | 420.64 | |
| Late Charges | 102.97 | |
| | | $11,862.07 |
| Filing and Service | 247.50 | |
| Title Report | 156.00 | |
| Sheriff's Sale | 107.00 | |
| Recorder of Deeds | 30.00 | |
| Notary Fee | 40.00 | |
| Counsel Fee | 950.00 | |
| | | 1,530.50 |
| | | $13,392.57 |

Current monthly payment $233.00
Current principal balance $17,158.24

---

1. The Claimant is apparently the successor to the Award/Contract between HUD and the Lo- mas & Nettleton Co. described in *In re Gillespie*, 110 B.R. 742, 751–54 (Bankr.E.D.Pa.1990).

The Complaint is in three Counts. The first Count alleges that the Claimant disregarded the Debtor's rights under the MAP in computing the interest component of both the arrearages due and the principal balance of the loan. The second Count, since withdrawn, sought recoupment under the federal Truth-in-Lending Act. The final Count attacks the Claimant's demands for fees and costs on the ground that the prejudgment notice sent by the Defendant to the Mortgagors pursuant to 41 P.S. ¶ 403(c) was materially in violation of Act 6, rendering all such fees and costs improper. *See In re Mosley*, 85 B.R. 942, 951–55 (Bankr.E.D.Pa.1988).

The proceeding came before us for trial on September 6, 1990. At that time, the parties presented us with a comprehensive Stipulation of Facts as the complete record, and proposed a briefing schedule contemplating the Debtor's filing an opening brief by September 17, 1990; the Claimant's filing its Brief by October 1, 1990; and the Debtor's filing a reply Brief by October 9, 1990. A settlement conference of October 3, 1990, before the Honorable Judith H. Wizmur of the District of New Jersey, ultimately proved unsuccessful, requiring preparation of this Opinion. Although the facts are stipulated and uncontested, they are sufficiently complex that we recite them, as abridged, in paragraph form, before launching into Conclusions of Law/Discussion of the pertinent legal issues.

## C. PERTINENT FACTS

1. On December 6, 1983, the Mortgagors purchased their home, residential real property located at 2132 South 67th Street, Philadelphia, Pennsylvania 19142 ("the Premises").

2. In order to purchase the Premises, the Mortgagors borrowed $17,407.00 from Larson Mortgage Company, evidenced by a Note and Mortgage ultimately assigned to Cenlar Federal Savings Bank ("Cenlar").

3. The Mortgage was insured by HUD pursuant to Section 221 of the National Housing Act.

4. Under the terms of the Mortgage, the Mortgagors were to pay $197.92 per month, beginning in February, 1984, plus escrow for taxes, fire insurance, and a service charge, for twenty years, at an interest rate of 12.5%.

5. The Mortgagors made monthly payments of $225.18 covering principal, interest, and escrow from February, 1984, through March, 1985, and then became delinquent. When they became delinquent, they were informed by Cenlar that they could request that HUD accept an assignment of the Mortgage under the MAP, and thereby obtain assistance in avoiding foreclosure, which they did.

6. The principal balance due on the Mortgage as of March 31, 1985, was $17,158.24.

7. On November 22, 1985, the Mortgagors were informed that HUD had accepted the mortgage assignment under the MAP, and, accordingly, on December 11, 1985, they entered into a "Forbearance Agreement" with HUD, to cover the period from February 1, 1986, through July 31, 1986.

8. The arrearage of the Mortgagors under the Mortgage as of October 31, 1985, was $1,666.88 (8 months × $208.36).

9. On December 19, 1986, the Mortgagors entered into another Forbearance Agreement, covering the period from January 1, 1987, through June 20, 1987.

10. On December 2, 1987, the Mortgagors entered into a third Forbearance Agreement, covering the period from December 1, 1987, through November 30, 1988. This contract required monthly payments of $215.66 beginning December 1, 1987. The contract further states that "after the expiration of this Forbearance Agreement on October 31, 1988, your 36 months of assistance will be finished and all further Forbearance Agreements must be at least equal to a full monthly mortgage payment of $215.66."

11. Although these contracts did not, of their own terms, cover every month from November 1, 1985, through October 31, 1988 ("Forbearance Period"), the parties agree that it was the intention of HUD and the Mortgagors that, between November 1, 1985, and November 30, 1987, the Mortgagors were not obligated to make any monthly Mortgage payments.

12. The Mortgagors made Mortgage payments to HUD in January and March through June, 1988, in the approximate amount of $215.56. After June, 1988, the Mortgagors made no further payments until the filing of this bankruptcy case.

13. During the Forbearance Period, HUD continued to accrue interest on the unpaid principal balance of $17,158.24 at the contract rate. Therefore, interest accrued at a monthly rate of $178.73 ($17,-158.24 × .125). HUD accrued total interest of $6,434.28 ($178.73 × 36) on the Mortgage during the Forbearance Period. However, the total of payments required to be made by the Mortgagors during the Forbearance Period was $2,587.92 (12 × $215.66).

14. On October 6, 1988, HUD sent a letter entitled NOTICE OF INTENTION TO FORECLOSE AND ACCELERATE MORTGAGE BALANCE AND TO REPORT TO CREDIT BUREAU ("the NOIF") to the Mortgagors, asserting that, as of October 31, 1988, they were required to pay $8,729.25 to bring the account current, and were required to pay $4,364.58 by October 31, 1988, to prevent foreclosure. No reference is made therein to the MAP, or that the Mortgagors might be terminated from continued participation in that program.

15. On June 20, 1989, HUD assigned the Mortgage to the Claimant pursuant to a contract very similar to that described by *Gillespie, supra,* 110 B.R. at 751-54.

16. On August 25, 1989, the Claimant sent the Mortgagors the NOTICE OF INTENTION TO FORECLOSE MORTGAGE described in *Sciortino I,* 114 B.R. at 429. This letter asserts that the Mortgagors are required to remit payments of $232.41 monthly from April, 1985, through August,

1989, plus an escrow deficit of $2,278.34, or a total of $14,595.57, to the mortgage holder within thirty days to avoid foreclosure. This notice also makes no mention of the MAP.

17. On October 27, 1989, the Claimant filed a mortgage foreclosure action against the Mortgagors in the Court of Common Pleas of Philadelphia County. On December 13, 1989, judgment was entered by default against the Mortgagors in that action. Damages were assessed as follows: $17,158.24 ("Principal balance"); Interest from 3/1/85 through 12/6/89 @ 12.5% ($10,372.35); Attorney's Fee at five (5%) percent of Principal Balance ($857.91); Late Charges ($548.70); Costs of Suit and Title Search ($350.00); and Escrow Deficit ($267.18), for a total of $29,554.38.

18. The Claimant has waived its claims for $30.00 for "Recorder of Deeds" and $40.00 for "Notary Fee" asserted in its Proof of Claim. The Debtor has waived any contest to the "Escrow" and "Late Charges" asserted in the Claim and has agreed that the $107.00 for "Sheriff's Sale" represents non-reimbursable monies paid to the Court on the Writ of Execution issued pursuant to the default judgment in the aforementioned state court mortgage foreclosure action.

CONCLUSIONS OF LAW/DISCUSSION

1. THIS COURT CAN HEAR AND DETERMINE THE RIGHTS OF THE CLAIMANT VIS-A-VIS THE DEBTOR, BUT WILL NOT DETERMINE THE RIGHTS OF THE CLAIMANT VIS-A-VIS THE WIFE.

Insofar as this proceeding attacks a proof of claim filed against the Debtor, it is a core proceeding which we can both hear and determine. 28 U.S.C. § 157(b)(2)(B).

However, as in *Sciortino I,* 114 B.R. at 428, we decline to make any rulings relating to the Claimant's rights against the Wife. As a non-debtor, the Wife cannot be the target of a proof of claim, even though her name appears, perhaps for the sake of identifying the account or for convenience, on the Proof of Claim filed by the Claimant. Therefore, she cannot assert

claims against the Claimant arising out of the Claimant's filing of a proof of claim which is properly directed against the Debtor only. *Cf. Mosley, supra*, 85 B.R. at 948.

Clearly, there is no core jurisdiction in this court to determine the rights of the Claimant against the Wife. Furthermore, there is no allegation of any impact that ascertainment of the Wife's rights will have upon the administration of the Debtor's estate. Therefore, we conclude that we lack "related to" subject-matter jurisdiction over the Wife's claim, *see In re Bobroff*, 766 F.2d 797, 802 (3d Cir.1985); *In re Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984); and *In re City Wide Press, Inc.*, 107 B.R. 68, 71–72 (Bankr.E.D.Pa. 1989), and we shall *sua sponte* dismiss the claims of the Wife asserted in this proceeding. *See In re Greenley Energy Holdings of PA.*, 110 B.R. 173, 179–80 (Bankr.E.D. Pa.1990).

### 2. THE DEBTOR IS ENTITLED TO RETAIN THE BENEFITS OF THE MAP BY CURING HIS DEFAULTS OF PAYMENTS DUE UNDER THAT PROGRAM.

■ As we indicated at page 370 *supra*, many issues in analysis of the rights of a debtor-mortgagor after assignment of a mortgage to HUD under the MAP have been mapped out in *Epps, supra;* and *Santos, supra*. *Santos*, a case of first impression not only locally but nationally on many of these issues, concerned debtors who, because of a delinquency under their original mortgage, requested and were accepted into the MAP. The *Santos* debtors entered into three forbearance agreements and two subsequent repayment agreements. They made the payments called for under the three forbearance agreements. However, they failed to satisfy the payment terms of the two repayment agreements.[2] As a result, HUD made several unsuccessful attempts to provide notice to the debtors of their delinquency and, later, of their de-

faults under the MAP. Subsequently, HUD also accelerated the amount owed under the assigned mortgage agreement.

In *Santos*, the court established a method for measuring the accrual of interest during the thirty-six month forbearance period of the MAP and, hence, defined the ability of Chapter 13 debtors to cure mortgage defaults thereunder. In addition, it addressed the point of the termination of the debtors' rights under the MAP. In determining the ability of a Chapter 13 debtor to cure a mortgage default under the MAP, Judge Fox began his analysis by citing *In re Roach*, 824 F.2d 1370 (3d Cir. 1987). In that case, the Court of Appeals, following the legal principles established in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), held that

> [t]he right to cure a mortgage default in Chapter 13 is defined with reference to non-bankruptcy law, generally state law ... Once non-bankruptcy law determines that the mortgage agreement itself is terminated, there is no federal right to resurrect the agreement through a bankruptcy filing. (citation omitted).

*Santos*, 97 B.R. at 236, citing *Roach*, 824 F.2d at 1377–79. Finding that the rights of the debtors were defined by federal non-bankruptcy law, since the debtors were participants under the federal MAP, the court focused on testimony regarding HUD's policy concerning the acceleration of a mortgage assigned to HUD. The *Santos* court found unpersuasive HUD's contention that it had fully terminated the rights of the debtors under the MAP when it sent them a NOIF. *Santos*, 97 B.R. at 237. It noted that

> HUD policy afforded employees the discretion to deaccelerate a delinquency demand after a notice equivalent to [the NOIF] had been sent ... Accepting that testimony as true, the issuance of [the NOIF] could not automatically terminate the assignment program (citations omitted).

---

**2.** The debtors paid to HUD $948.50 of the required $3,529.08 during the first repayment agreement. However, they made no payments under the second repayment agreement. *Santos*, 97 B.R. at 230.

*Id.* Further, the court recognized, regarding the policy underpinnings inherent to the MAP, that

> [c]onsistent with the goal of decent and affordable housing for all is the recognition that if the mortgagor can repay HUD all missed prepetition payments under the assignment program and remain current on requisite postpetition payments, both HUD and the homeowner benefit. HUD's benefit stems from avoiding the costs associated with foreclosing, as well as owning property often left vacant and vandalized ... [t]he mortgagor benefits by retaining decent housing (citation omitted).

*Id.*

In acknowledging these significant policy considerations, the court held that, although it did not definitively determine when the debtors' rights terminated, the debtors' rights under the MAP did not end with the dispatch of the NOIF. Rather, the court held that "the mortgagor's assignment program rights are irrevocably lost later rather than earlier in the foreclosure process ... [this court] need only conclude ... that the loss of rights does not occur with the first acceleration notice." *Id.*

*Epps*, in addition to disposing of numerous jurisdictional and procedural issues not raised in *Santos* or here, 110 B.R. at 695–701, carried the analysis regarding the termination of a mortgagor's rights under the MAP farther. That court held that an agency relationship existed between HUD and the parties to whom it assigns the mortgages for foreclosure. *Id.* at 698–99. The court also expended considerable energy distinguishing a "payoff" and "cure arrears" of a mortgage and how payment of both may be satisfied by a Chapter 13 debtor-mortgagor. *Id.* at 706–07. The *Epps* court emphasized that the right to cure the default of a long-term obligation, such as a mortgage default, is permitted pursuant to 11 U.S.C. § 1322(b). *Id.* at 707. Further, it stated, at *id.*, that

> [t]he "arrearage" or "cure" figure is to be be distinguished from the "pay off" figure ... The pay off figure is HUD's

allowed secured claim and equals the amount needed to pay the mortgage balance in full as of the date of the bankruptcy petition. *In re Santos*, 97 B.R. 227, 229 (Bankr.E.D.Pa.1989). The arrearage figure, on the other hand, is the sum of all prepetition funds that should have been paid to HUD in accordance with the Mortgage Assignment Program.

It also concluded that the arrearage figure is all payments which should have been paid to HUD during a mortgagor's forbearance period(s). *Id.* This figure was said to consist of all unpaid amounts for "interest and principal due during the thirty-six month forbearance period of reduced payments and the post-forbearance period and the post-forbearance period and the filing of the petition; and tax advances made between the commencement of the forbearance period and the filing of the [bankruptcy] petition." *Id. Accord, e.g., In re Vitelli*, 93 B.R. 889, 994–95 (Bankr.E.D.Pa. 1988); and *In re Small*, 65 B.R. 686, 689–92 (Bankr.E.D.Pa.1986), *aff'd*, 76 B.R. 390 (E.D.Pa.1987).

In resolving how late in the foreclosure process a mortgagor may deaccelerate its mortgage balance, the *Epps* court stressed that, absent a federal countervailing interest, the mortgagor's property rights are determined by state law. *Id.* However, following the precedent set in *Santos*, the *Epps* court ruled that federal non-bankruptcy law applied to mortgages in the MAP, and that the pertinent law was set forth in HUD's Handbook 4335.2 ("the Handbook"). Referring to policy articulated in *Santos*, the *Epps* court stated that the benefit accruing to HUD in allowing a mortgagor to repay missed prepetition obligations under the MAP is avoidance of costs associated with foreclosure. *Id.* at 708, quoting *Santos*, 97 B.R. at 237. Therefore, it concluded that, "[c]onsistent with that policy and with Handbook # 4335.2 ... a mortgagor's rights under the HUD Mortgage Assignment Program retain validity until a foreclosure judgment is entered." 110 B.R. at 708.

The arguments set forth by the Claimant can be summed up in its statement that it

disagrees with the conclusions in *Epps* and *Santos* and believes that the rights of mortgagors in the MAP program should terminate upon the reference of the mortgage for foreclosure by HUD or its agents. No authority for this position is given except a reference to the Hornbook,. which the Claimant admits provides that referral for foreclosure is *not* a mortgagor's last opportunity to resolve a MAP delinquency. Especially since forfeiture of important possessory rights to residential real estate are not favored in the law, *see In re C & C TV & Appliance*, 103 B.R. 590, 592 (E.D. Pa.1989); and *In re Rowe*, 110 B.R. 712, 719 (Bankr.E.D.Pa.1990); and *In re Fox*, 83 B.R. 290, 297–98, 301 (Bankr.E.D.Pa.1988), we choose to follow the holdings of *Epps* and *Santos* contrary to the Claimant's position.

By applying the principles of *Santos* and *Epps* to the present adversary proceeding, we can readily conclude that the Debtor's rights under the MAP did not terminate upon the dispatch of the NOIF to him. We note that the NOIF, like the subsequent letter from the mortgage holder, makes no mention of any termination of the Mortgagors' rights under the MAP.

Although a foreclosure judgment was entered against the Debtor, our Order accompanying *Sciortino I* vacated that judgment. We agree with the Debtor's argument that our Order vacating the judgment rendered it "utterly and entirely void." *In re Allen*, 69 B.R. 867, 872 (Bankr.E.D.Pa.1987). *See also* 91 C.J.S. 773–74 (1955); and BLACK'S LAW DICTIONARY 1388 (5th ed. 1979). Therefore, the Debtor's stance is legally the same as that of a MAP participant who has not had a foreclosure judgment entered against him. Pursuant to the conclusions articulated in *Epps*, 110 B.R. at 708–09; and *Santos*, 97 B.R. at 236, the Debtor's rights under the MAP must be deemed to have not been terminated at the present time.

We should observe that, for two reasons, we do not necessarily agree with the conclusion in *Epps* that a mortgagor's rights under the MAP terminate upon the entry of a foreclosure judgment. The *Epps*

court reaches this conclusion because of its finding that the Handbook (which was not considered by the *Santos* court, apparently because it was not introduced into the record), provides that foreclosure proceedings can be suspended if "fruitful" negotiations with the mortgagor are deemed feasible, pursuant to §§ 5–6A and B of the Handbook. However, we note that § 5–6A(2) of the Handbook thusly indicates that suspension of foreclosure proceedings may occur *beyond* the date of the foreclosure sale:

5–6. SUSPENSION OR TERMINATION OF FORECLOSURE

.    .    .    .    .    .

A. *Reasons for Suspension of Foreclosure*

.    .    .    .

(2) Fruitful negotiations with the mortgagors which will lead to a resolution similar to those described in 5–3A (above), *but which may extend beyond the date of the sheriff's sale* (emphasis added).

Thus, the federal guidelines, by which HUD is bound, envision a mortgagor's retention of rights under the MAP not only after the foreclosure judgment, but even after a sheriff's sale executing upon a foreclosure judgment.

The second reason relates to the rights provided to a mortgagor by applicable Pennsylvania state law, *i.e.*, Act 6. Act 6 provides that a mortgagor may generally cure a mortgage-payment default "at any time at least one hour prior to the commencement of bidding at a sheriff's sale or other judicial sale on a residential mortgage obligation." 41 P.S. § 404(a). There is apparently no question that Act 6 applies to the instant mortgage obligation to some degree. *See Sciortino I*, 114 B.R. at 428–29. In *Santos*, Judge Fox refused to rely upon Act 6 as the sole basis for determining when the debtors' rights were terminated because he believed that the only cure required under Act 6 was according to the terms of the parties' original mortgage. 97

B.R. at 236–37.[3]

We do not consider this conclusion intuitive. Rather, we believe that it is equally plausible to characterize the rights accorded to the Debtor under the MAP as a modification to the original terms of the mortgage. Then, the applicable state law of Act 6 could be applied to the mortgage as modified, and could allow the MAP mortgagor until one hour before the sheriff's sale to cure defaults in the mortgage agreement, as modified by rights arising from the MAP.

This conclusion suggests that the *Epps* and *Santos* courts may have unnecessarily applied rather hazy federal non-bankruptcy law to determine the time of termination of the mortgagors' MAP rights instead of very clear applicable state law. We recognize, however, that in *Ayers v. Philadelphia Housing Authority*, 908 F.2d 1184, 1189–93 (3d Cir.1990); and *United States v. Spears*, 859 F.2d 284, 288–91 (3d Cir.1988), the Court of Appeals held that Act 6 did not apply at all to mortgage foreclosures effected pursuant to federal programs. These decisions might justify a conclusion that the federal, MAP aspect of the Debtor's bundle of rights as mortgagor should be determined under federal law. However, the instant factual setting is distinguishable from that in *Ayers* and *Spears*, in that the original contracts in issue there were between the homebuyer and the government, and they expressly provided that certain federal law was applicable to their interpretation. *See Ayers*, 908 F.2d at 1186; and *Spears*, 859 F.2d at 289.

If Act 6 were applied to determine when the rights of a mortgagor participating in the MAP were terminated, then the period one hour before the sheriff's sale would constitute a bright-line test for when these rights would terminate. *See In re Rivera*, 108 B.R. 553, 554 (Bankr.E.D.Pa.1989); and *In re Brown*, 75 B.R. 1009, 1012 (Bankr.E.D.Pa.1987). There is certainly a symmetry and convenience to be gained from a holding that all of a mortgagor's rights, under

the original mortgage as well as under the MAP, are terminated at the same time. However, we also note that § 5–6A(2) of the Handbook provides that the mortgagor's rights under the MAP may survive even *after* a post-foreclosure sheriff's sale, and hence *after* the cutoff period provided by 41 P.S. § 404(a) of Act 6.

We need not speculate on these issues further to resolve this proceeding. Rather, we can readily conclude here that, under applicable state law, and possibly applicable federal law, under the holdings in *Epps* and *Santos*, and certainly under the more expansive determination of the time of termination of a mortgagor's rights under the MAP suggested here, the rights of the instant Debtor to the benefits of the MAP cannot be deemed to be cut off at this juncture.

3. THE CLAIMANT IS ENTITLED TO ATTORNEYS' FEES OF $300 AND THE $510.50 OF COSTS DEMANDED.

■ The parties adopt quite distinct positions on the liability of the Debtor for the "Counsel Fee" of $950 and the costs totalling $510.50 for "Filing and Service," "Title Report," and "Sheriff's Sale" enumerated in the Proof of Claim. *See* page 371 *supra*. The Debtor claims that, since the Claimant has been determined to have presented a "substantially defective" Act 6 notice to him, *Sciortino I*, 114 B.R. at 429, all of the fees and costs expended in the foreclosure effort should be disallowed. *See Vitelli*, *supra*, 93 B.R. at 897–99; and *Mosley*, *supra*, 85 B.R. at 951–55. The Claimant, meanwhile, argues that its entire complement of charges should be allowed because they were expended in furtherance of a valid judgment, *see Werts v. Federal National Mortgage Ass'n*, 48 B.R. 980, 985 (E.D.Pa.1985), with exception of a limit of the attorneys' fees to $857.91 because of a five (5%) percent cap in the Mortgage. *See*

---

**3.** In fact, HUD apparently argued, in *Santos*, that Act 6 precluded the debtors from asserting that any cure less than a cure of the original

terms of the mortgage would not be effective. 97 B.R. at 237.

*In re Johnson–Allen*, 67 B.R. 968, 975–77 (Bankr.E.D.Pa.1986); *In re Perry*, 59 B.R. 947, 951 (Bankr.E.D.Pa.1986); and *In re Schultz*, 58 B.R. 945, 949 (Bankr.E.D.Pa. 1986).

We cannot agree entirely with the position of either party. The foreclosure judgment underlying the Claimant's contentions was vacated in *Sciortino I*, and therefore its existence cannot serve as a basis to support the fees and costs included therein. The foreclosure proceedings were blissfully uncontested until after the removal of same to our court. *Sciortino I*, 114 B.R. at 424–25. Therefore, under our holding in *In re Nickleberry*, 76 B.R. 413, 420–23 (Bankr.E.D.Pa.1987), the Claimant's attorneys' fees should be limited to $300.

On the other hand, we decline to reward the Debtor for his lack of vigilance in belatedly attacking the judgment against him by wiping out the legitimate attorneys' fees and uncontested items of costs expended prior to his awakening. We struck such claims on the basis of Act 6 violations in *Mosley* only because the parties stipulated, presumably with some give-and-take bargaining, on an all-or-nothing basis contingent upon whether any Act 6 violation was present in that mortgagor's 41 P.S. § 403(c) notice.

In *Vitelli*, we declined to eliminate the debtor's liability for costs despite the mortgagee's clear violations of Act 6. In so doing, we analyzed the course of the state-court proceedings and concluded that an Act 6 notice-deficiency would justify striking all costs and fees only "if a mortgagee failed to provide any notice as required by § 403(c) at all, or committed some other egregious violation." 93 B.R. at 899. Here, we similarly find that the mortgagee's violations of Act 6, though very real, do not, when considered in the context of the Debtor's lack of diligence justifying the expenditures made, support a striking of these costs in their entirety. Therefore, the costs of $510.50 requested, plus $300 for attorneys' fees, will be allowed to the Claimant.

4. COMPUTATIONS: THE CLAIMANT IS ALLOWED A SECURED "CLAIM" FOR MORTGAGE ARREARAGES OF $7,667.50, AND ITS DEMAND FOR PRE–PETITION INTEREST ON ITS FULL SECURED CLAIM WILL BE REDUCED TO $6,341.25.

■ All that remains is the task of computing the rightful sum of the Claimant's "claim" for mortgage arrearages and determining the permissible interest which it can charge on its full claim under the principles established by Judge Fox in *Santos*. The Debtor posits, and the Claimant does not deny, that, apart from the MAP, the arrearages of principal and interest should have been computed by multiplying the 57 months of delinquent payments times the stipulated monthly payment of $197.92. This yields a figure of $11,281.44, slightly less than the $11,338.46 figure which can be culled from the proof of claim. However, the parties agree that all payments were suspended pursuant to the terms of the MAP for the 25–month period from November, 1985, to November, 1987. Therefore, if, as we concluded, the Debtor's participation in the MAP remains viable, the $11,281.44 figure must be reduced by 25 × $197.92, or $4,948.00, resulting in a net figure of $6,333.44.

The Debtor contends that payments were suspended since April, 1985, and we should reduce the principal and arrearage by an additional 7 × $192.92, or $1,385.44. Since we can find no basis in the record for this claim of an additional suspension of payments prior to November, 1985, we shall keep the figure at $6,333.44. To this may be added the $523.61 uncontested "Escrow" and "Late Charges" and the $810.50 of allowable attorneys' fees and costs. The sum of all of these figures, *i.e.*, $7,667.56, is the rightful amount of mortgage arrearages which can be demanded by the Claimant.

■ Finally, the Debtor also requests that we determine the proper amount of the Claimant's accrued pre-petition interest on its full claim for the mortgage balance. In line with *Santos*, the Debtor argues that

"interest continues to accrue during the forbearance period but only to the extent that it does not exceed the homeowner's forbearance payment.... If the interest is greater, the difference is forgiven—there is no negative amortization." 97 B.R. at 235. Under the terms of the third Forbearance Agreement, the Debtor was required to make twelve monthly payments of $215.66, which amounts to a total of $2,587.92. Accordingly, the Debtor argues that the Claimant's claim of pre-petition interest, when correctly stated as $10,187.61,[4] should be reduced by the amount of accrued interest forgiven during the Forbearance Period. This amount is the difference between the amount allegedly accrued during the thirty-six month Forbearance Period, $6,434.28 ($178.73 × 36), and the amount the Debtor was required to pay pursuant to the third Forbearance Agreement, $2,587.92. This amount is therefore $3,846.36. Thus, the Debtor argues that pre-petition interest should be in $10,187.61 less $3,846.36, or $6,341.25.

In its Brief, the Claimant does not contest the accuracy of these calculations of pre-petition interest under the formula developed in *Santos*. Instead, it argues that the Debtor is not entitled to further relief under the MAP and that, therefore, the Debtor is not entitled to reduction of the Claimant's Proof of Claim. This court has rejected that argument. *See* pages 374–77 *supra*. Therefore, this court holds that, consistent with *Santos* and the Debtor's argument, the pre-petition interest component of the Claimant's claim for the full balance due is determined to be $6,341.25.

## D. CONCLUSION

An Order consistent with the foregoing conclusions will be entered.

### ORDER

AND NOW, this 24th day of October, 1990, upon consideration of the Stipulation of Facts which counsel agreed would constitute the record of this proceeding in open court on September 6, 1990, and the subsequently filed Briefs of the parties in support of their respective positions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Plaintiff–Debtor, EMILIO J. SCIORTINO ("the Debtor"), and against Defendant MORTGAGE DEFAULT SERVICES, INC. ("the Claimant").

2. The valid "claim" of the Claimant against the Debtor for arrearages is DETERMINED to be $7,667.56.

3. It is DECLARED that the valid pre-petition interest component of the Claimant's claim for the full balance due to it from the Debtor is $6,341.25.

4. The claims of Plaintiff DOROTHY J. SCIORTINO in this proceeding are DISMISSED due to the court's lack of subject-matter jurisdiction over her claims, without prejudice as to the merits of her claims.

---

**4.** The total pre-petition interest, based on 57 months at $178.73, should be $10,187.61. This court is uncertain from where the additional $65.57, included in the Claimant's calculation of pre-petition interest in its Proof of Claim in the amount of $10,253.18, materialized.