**In re Lola BLAKENEY, Debtor.**

**Lola BLAKENEY, Plaintiff,**

v.

**BENEFACT MORTGAGE, Lomas Mortgage USA, Inc. and Edward Sparkman, Trustee, Defendants.**

Bankruptcy No. 89–11847S.
Adv. No. 90–0757S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 5, 1991.

Memorandum on Motion for
Reconsideration March 28, 1991.

450

Roger V. Ashodian, Delaware County Legal Assistance Ass'n, Chester, Pa., for debtor-plaintiff.

Rebecca Landis, Philadelphia, Pa., for Benefact Mortg., Lomas Mortgage USA, Inc.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant adversary proceeding requires us to address several issues not previously touched upon in the line of decisions in this jurisdiction concerning calculation of arrearages and proofs of claim in cases concerning mortgages previously assigned to the United States Department of Housing and Urban Development ("HUD") in connection with its Mortgage Assignment Program ("MAP"), established pursu-

ant to 12 U.S.C. § 1715u(b). These cases include *In re Epps,* 110 B.R. 691 (E.D.Pa. 1990); *In re Sciortino,* 120 B.R. 369 (Bankr.E.D.Pa.1990); and *In re Santos,* 97 B.R. 227 (Bankr.E.D.Pa.1989).[1]

Each party takes what we consider an extreme position. The Debtor argues that her participation in the MAP allows us to disregard entirely a post-assignment foreclosure judgment against the Debtor in calculating the mortgagee's total claim. She also contends that we should recompute the amount which she previously agreed to pay under at least one of her MAP forbearance agreements in calculating the arrearages. The assignees of the mortgage argue that we must disregard the Debtor's participation in the MAP entirely in computing both its total claim and the mortgage arrearages due to it because of the entry of the foreclosure judgment.

We conclude that the judgment is the basis for computing the mortgagee's total claim, but that the Debtor's participation in the MAP must be considered in computing the arrearages.

Unfortunately, the 5½ years duration between the end of the MAP forbearance period and the Debtor's bankruptcy filing; a substantial delay of the Debtor in submitting her Plan of Reorganization after her bankruptcy filing; and the Debtor's failure to keep her post-petition mortgage payments current have greatly increased the payments which the Debtor must make to merely cure her mortgage arrearages. Arrearages of about $16,500 must be packed into only 40 remaining months of the Plan. By our calculations, this will require the Debtor to make monthly payments of about $450 towards arrearages, plus maintain her regular monthly payment of $247.20, total monthly payments of about $700. Such payments appear to be beyond the Debtor's financial capabilities. We will, however, provide her a short period to

---

1. Several of these issues were addressed in two Adjudications of ours which will not be widely published, *In re Clarke, Clarke v. Mortgage Default Services,* Bankr. No. 90–11685S, Adv. No. 90–0833S, 1991 WL 17872 (Bankr.E.D.Pa. February 12, 1991); and *In re Ahmed, Ahmed v. Mortgage Default Services,* Bankr. No. 90– 10673S, Adv. No. 90–0801S, 1991 WL 13723 (Bankr.E.D.Pa. February 5, 1991). The discussions of pertinent issues in these Adjudications are expanded or reiterated here and we have not cited these decisions as authority because of their summary format.

attempt to prepare a further Amended Plan consistent with the conclusions reached in this Opinion.

### B. PROCEDURAL HISTORY

The Debtor filed the bankruptcy case underlying this proceeding on May 18, 1989. However, in the fashion which we condemned in *In re Cobb*, 122 B.R. 22, 26–27 (Bankr.E.D.Pa.1990), she delayed in filing a Plan of Reorganization (or her Schedules) until January 9, 1990, in violation of 11 U.S.C. § 1326(a)(1) and/or Bankruptcy Rule 3015. The Plan contemplated no payments until February, 1990; payments of $75 or less monthly through January, 1991; and then payments of $256.85 for 36 months, a total of payments of about $10,500.

In the meantime, on August 16, 1989, defendant LOMAS MORTGAGE USA ("Lomas"), at that time the servicing agent of mortgages previously assigned to HUD under the MAP, filed a "proof of claim" for arrearages of $32,317.55, itemized as follows:

### BREAKDOWN

| ARREARAGES | |
|---|---:|
| 114 monthly payments at $255.20 from 12/79 through 5/89 | $29,092.80 |
| 114 late charges at $9.00 from 12/79 through 5/89 | 1,026.00 |
| Total | $30,118.80 |

| ATTORNEY'S FEES AND COSTS | |
|---|---:|
| Attorney's Fees—Foreclosure | $ 625.00 |
| Attorney's Fees—Prep. of Deed from L & N to HUD | 50.00 |
| Attorney's Fees—Bankruptcy—Proof of Claim | 50.00 |
| Title Report | 156.00 |
| Recorder of Deeds—Rec. Assgn. | 13.50 |
| Dept. of Records—Rec. Assgn. | 30.00 |
| Office of Judicial Support | 125.00 |
| Recorder of Deeds | 2.00 |
| Sheriff—Serv. of Comp. | 22.75 |
| Office of Judicial Support—Writ of Execution | 24.00 |
| Sheriff—Deposit with Sale | 1,100.00 |
| Total | 2,198.75 |
| GRAND TOTAL | $32,317.55 |

On November 15, 1989, Lomas further proceeded to file a motion seeking relief from the stay to foreclose upon the Debtor's home, situated at 602 Broxton Drive, Ridley Park, PA 19078 ("the Home"). Given what we now know, it seems strange that Lomas, after three continuances, withdrew this motion on April 5, 1990.

The delay in the Debtor's filing of her Plan and Schedules put off the initial listing of the confirmation hearing until August 7, 1990. After one continuance of this hearing, Defendant EDWARD SPARKMAN, TRUSTEE, the Standing Chapter 13 Trustee ("the Trustee"), filed a motion to dismiss this case on the ground that, in local parlance, it was "infeasible." *i.e.*, the secured claims exceeded the funds to be paid into the Plan. *See* 11 U.S.C. § 1325(a)(5)(B)(ii); and *In re Fricker*, 116 B.R. 431, 436 (Bankr.E.D.Pa.1990).

The instant proceeding was filed on September 28, 1990, undoubtedly in response to our Order of September 24, 1990, which stated, in pertinent part, as follows:

upon advice at the Confirmation hearing on September 18, 1990, that the Debtor's Plan in this neglected case still cannot be confirmed because the Plan is not feasible due to presence of claims of which will be subject to attack in an adversary proceeding, ... [t]he Debtor ... shall

resolve the outstanding feasibility problem by filing an adversary proceeding or by some other means before the next listing, or this case will be dismissed and.... Any adversary proceeding must be filed and served upon interested parties on or before September 28, 1990. Named as Defendants in the proceeding are BENEFACT MORTGAGE COMPANY ("Benefact"), Lomas's successor as HUD's servicing agent, Lomas itself, and the Trustee.

The Complaint contains three Counts. The first alleges that Benefact has not properly computed, pursuant to the guidelines articulated in *Santos, supra,* in regard to mortgagors which are or were participants in the MAP, the balances due it on the Debtor's mortgage. The second Count attacks allegedly inaccurate or excessive claims for "Attorney's Fees" and the "Sheriff's Deposit" and complains that the monthly payment included a $9.00 monthly late charge even though the monthly payment amount of $255.20 already included a late charge. The third Count asserts a $1,000 claim for a recoupment based upon alleged violations of the federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.* ("The TILA"), in the writing of the mortgage.

The trial of this adversary proceeding was initially scheduled for November 10, 1990. The trial was continued and was ultimately conducted on a must-be-tried basis on December 6, 1990. After a painfully-tedious trial in which we received voluminous documentation from both counsel, we gave the parties, by Order dated December 7, 1990, the opportunity to file Proposed Findings of Act, Proposed Conclusions of Law, and Briefs by January 10, 1991 (the Debtor), and February 11, 1991 (the Defendants). The hearings on confirmation and the Trustee's motion to dismiss were continued until March 5, 1991.

One post-trial series of events in the Debtor's main case is worthy of note. The Debtor, in response to an Order of November 21, 1990, was required to file a motion to abate delinquent plan payments to the Trustee or face dismissal of her case. On January 3, 1991, we granted that motion on the caveat that the Debtor pay at least $100 to the Trustee by January 15, 1991, and $200 to the Trustee on or before February 15, 1991, and the 15th day of each successive month. On January 3, 1991, the Debtor also filed an Amended Plan, calling for payments totalling $147.40 through January, 1990; $25 monthly from February through July, 1990; $50 monthly from August 1990, through January, 1991; $200 monthly from February, 1991, through January 1992; and $315.36 from February, 1992, through January, 1995. Our Order of January 3, 1991, reflected our pessimism that this Plan was sufficiently funded to be confirmable.

## C. FINDINGS OF FACT

1. In consideration for a purchase-money loan of $23,400.00 from Kirk Mortgage Co. ("Kirk"), on or about November 30, 1973, LOLA BLAKENEY ("the "Debtor") and her ex-husband, Richard T. Blakeney, executed a Note and Mortgage in favor of Kirk. Kirk immediately assigned the Mortgage to Central Pennsylvania Savings Association on November 30, 1973.

2. On or about December 1, 1979, the Debtor defaulted in making the necessary payments on the mortgage. Shortly thereafter, the Debtor applied to HUD to take an assignment of the mortgage under the MAP.

3. HUD accepted assignment of the Debtor's mortgage on September 23, 1990, under the MAP.

4. The monthly mortgage payments due under the first Forbearance Agreement executed by the Debtor, pursuant to the MAP, extending from December, 1980, through November 1981, were $66.00.

5. On December 16, 1980, the Debtor filed a Chapter 7 bankruptcy case in this court, at Bankr. No. 80–03329K. The case remained open until it was closed, subsequent to the Debtor's discharge, on August 17, 1982.

6. HUD suspended payments on the mortgage from the date of the bankruptcy filing until October 1, 1982. According to the testimony at trial of Joanne Peak, a

supervisory loan specialist for HUD, HUD did not have a formal policy for treating mortgage assignments during a mortgagor's bankruptcy at the time of the Debtor's first bankruptcy. Instead, HUD simply did not bill the Debtor during the period of bankruptcy.

7. The parties next executed a "Repayment Plan" which encompassed the period from October 1, 1982, through September 1, 1983, and contemplated monthly payments of $255.12.

8. Although executing same, the Debtor, thereafter, protested the payment amount under this "Plan" as excessive. HUD thereupon prepared a new Forbearance Agreement which was to run from February 1, 1983, through November 1, 1983, and called for payments of $50.00 monthly.

9. The Debtor executed two subsequent Forbearance Agreements covering the periods from November 1, 1983, through December 31, 1984, and from October 1, 1985, through August 31, 1986, respectively. Both of these Agreements provided for the Debtor to make her regular mortgage payments of $247.20, and therefore it appears that the forbearance period effectively ended in December, 1983.

10. The parties stipulated that at least the following payments were made by the Debtor on the following respective dates and were credited to the Debtor's account by HUD:

| | | |
|---|---|---|
| a. | December 9, 1980: | $ 66.00 |
| b. | March 24, 1983: | 100.00 |
| c. | August 26, 1983: | 170.00 |
| d. | December 23, 1983: | 100.00 |
| e. | March 20, 1984: | 247.20 |
| f. | April 4, 1984: | 247.00 |
| g. | June 7, 1984: | 247.20 |
| h. | December 11, 1984: | 300.00 |
| i. | July 12, 1985: | 2,000.00 |
| j. | October 3, 1985: | 494.40 |
| k. | November 19, 1985: | 247.20 |
| l. | December 13, 1985: | 247.20 |
| m. | January 30, 1986: | 247.20 |
| n. | March 6, 1986: | 247.20 |
| o. | May 1, 1986: | 247.20 |
| p. | July 16, 1986: | 247.20 |
| q. | January 7, 1987: | 310.00 |
| | SUBTOTAL | $6,165.28 |
| r. | May 16, 1990: | 2,377.80 |
| | TOTAL | $8,543.08 |

11. The Debtor claimed that certain additional payments which she made to HUD during the period in issue were not credited to her. However, the Debtor could not recall exactly when these payments were made and did not present any documentary evidence, such as receipts, establishing that she actually made any additional payments. The testimony of her prior counsel, Shelley Farber, Esq., did not establish that any payments made were not credited. Her post-trial submission contends that one $247.20 payment was not properly credited. We found the Debtor's testimony to be too fragmented and uncertain to convince us that HUD in fact failed to credit all of the payments made, and we conclude that the foregoing recitation of payments in fact includes all of the payments that the Debtor actually made.

12. On September 21, 1988, a mortgage foreclosure action was filed against the Debtor in the court of Common Pleas of Delaware County, PA. ("the CCP") by Lomas on behalf of HUD. On February 24, 1989, judgment was entered against the Debtor in the action by default in the amount of $4,387.07. A sheriff's sale of May 19, 1989, in execution upon this judgment, was stayed by the Debtor's bankruptcy filing on May 18, 1989.

13. Pursuant to a Stipulation of Facts presented at trial, Benefact agreed to reduce the attorneys' fees in the proof of claim to $300.00, and, on account of a refund of $166.80 from the sheriff, and agreed to reduce the "Sheriff–Deposit with Sale" figure on the proof of claim to $933.20. Finally, Benefact stipulated that it intended the $9.00 monthly figure of the proof of claim to represent "service charges," not late charges.

14. Although the budget included in the Debtor's Chapter 13 Statement indicated that she would pay the current mortgage payments of $247.20 during the course of the bankruptcy, the Debtor admitted that, except for the $2377.80 payment to HUD on May 16, 1990, she had made no post-petition payments directly to HUD.

15. The Debtor suggested that her adult stepdaughter, who had been awarded over $20,000 in a tort case, might be able to assist her in making mortgage payments in the future.

16. Although the Debtor, in her post-trial submission, asserts that she testified that she looked through numerous boxes in her home but could not find a TILA disclosure statement at trial, we, like Benefact, could not locate any such testimony in the trial transcript. We believe that the Debtor is confusing this testimony with her descriptions of her unsuccessful searches to find receipts and payments which HUD had failed to credit to her.

### D. CONCLUSIONS OF LAW/DISCUSSION

1. THE DEBTOR MAY TAKE HER PARTICIPATION IN THE MAP INTO ACCOUNT WHEN CALCULATING HER ARREARAGES DUE TO BENEFACT, DESPITE THE ENTRY OF A FORECLOSURE JUDGMENT AGAINST HER.

■ This court is guided, in large part, by the prior decisions in *Santos, Epps* and *Sciortino* on the issue of whether the Debtor may consider participation in the MAP in determining what arrearages she owes to Benefact in the post-foreclosure period.

*Santos* made several determinations of first impression. It analyzed and defined the ability of Chapter 13 debtors, like the Debtor, to cure MAP mortgage arrearages and was the first case to broach the issue of when the termination of a former MAP participant's right to assert her payments under the MAP in computing arrearages cure a mortgage deficiency occurred. In his analysis of the HUD policy, our colleague, the Honorable Bruce Fox, in *Santos,* recognized HUD's argument that it fully terminated the former MAP participant's rights under the MAP when it sent the debtor's Notice of Intention to Foreclose ("NOIF"). Judge Fox noted that

> HUD policy afforded employees the discretion to deaccelerate a delinquency after a notice equivalent to [the NOIF] had been sent ... the issuance of [the NOIF] could not automatically terminate the assignment program ... the mortgagor's assignment program rights are lost later rather than earlier in the foreclosure process ... (citations omitted).

97 B.R. at 237.

*Epps* accepted the analysis presented in *Santos,* and established that the rights of a former MAP participant are terminated no sooner than the entry of a foreclosure judgment. The *Epps* court acknowledged that

> HUD's directives that foreclosure proceedings do not terminate [a MAP] mortgagor's rights where there is good reason to believe that the mortgage will cure her defaults ... as well as national housing policy counselling foreclosure avoidance for assignment program mortgagors who are delinquent on their mortgage payments....

110 B.R. at 708–09.

Applying the same policy considerations enunciated in *Santos* and *Epps,* we found, in *Sciortino,* that the Debtor may take her participation in the MAP into account in calculating her arrearages even after entry of a foreclosure judgment.

As noted, *supra,* the basis for *Santos* holding that a former MAP participant could consider the payments due under the MAP in curing arrearages even after issuance of the NOIF by HUD, was that, in administering the foreclosure portion of the MAP, HUD employees possessed the discretion to halt the march to foreclosure by decelerating a delinquency. 97 B.R. at 237. The *Epps* court, like that in *Santos,* reasoned that foreclosure proceedings do not terminate a former MAP's participant right to cure arrearages under the MAP, not only because of certain inherent discretion on the part of HUD employees, but also because HUD policy directs that a mortgagor's rights should not be terminated when there is a probability that the MAP participant could satisfactorily cure mortgage arrearages. 100 B.R. at 208–09.

Keeping in mind the policy considerations enunciated in *Santos* and *Epps,* in

*Sciortino,* we reviewed HUD Handbook 4335.2, as did the *Epps* court. We concluded that pursuant to § 5–6A(2) of the Handbook, HUD employees have the discretion to suspend foreclosure proceedings even *after* a sheriff's sale, which necessarily follows entry of a foreclosure judgment. 120 B.R. at 376. We also found that pertinent Pennsylvania state law, 41 P.S. § 404(a), allows a mortgagor to cure any default in mortgage payments subsequent to the entry of a judgment, up to one hour prior to a sheriff sale. *Id.* at 376–77. Therefore, we reasoned that the terms of a MAP forbearance agreement effect a modification of the terms of the parties' mortgage, thereby permitting a former MAP participant to invoke the terms of the MAP in computing arrearages up to one hour prior to a sheriff's sale. *Id.* at 377. We herein reaffirm that reasoning in *Sciortino.*

At trial, Benefact initially argued that *Epps, Santos,* and *Sciortino* were all wrongly decided and that, if the debtor were permitted to cure a default under 41 P.S. § 404(a), it would be accomplished only if it were done consistently with the terms of the original mortgage.

As a fall-back position, Benefact argues, firstly, that we are obliged to adhere to dictum in *Epps* (since no judgment was entered against the *Epps* debtor, it was only necessary for the court to decide that the right was cut off no sooner than entry of judgment) concluding that the cut-off period for considering HUD's foreclosure in computing arrearages is the entry of judgment. No court is ever bound by the mere *dictum* of court whose holdings it is obliged to follow. *See United States v. Vignola,* 464 F.Supp. 1091, 1099 (E.D.Pa.), *aff'd,* 605 F.2d 1199 (3d Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980). Furthermore, it is not clear that bankruptcy courts are bound to follow the rulings of the district court of which they are a unit. *See In re Windsor Communications Group, Inc.,* 67 B.R. 692, 699 (Bankr.E.D.Pa.1986).

Secondly, Benefact argues that the entry of foreclosure judgment against the Debtor in the CCP on February 24, 1989, effected the merger of the mortgage into the foreclosure judgment, extinguishing the original parties' mortgagor-mortgagee relationship, and, presumably, any rights that the Debtor would have under the MAP. *See In re Herbert,* 86 B.R. 433, 436 (Bankr.E.D. Pa.1988), *aff'd sub nom. Herbert v. Federal Nat'l Mortgage Ass'n,* 102 B.R. 407 (1989). *Accord, e.g., In re Klein,* 106 B.R. 396, 401–02 (Bankr.E.D.Pa.1989), and cases cited therein.

This argument clearly proves too much. If, according to Benefact, the doctrine of merger destroys the right of a mortgagor to cure in the contest of a mortgage under the MAP, then it would destroy the right of any Pennsylvania mortgagor to cure a default in payments on a mortgage after a judgment has been entered, thus eviscerating the express provision of a post-judgment right to cure which is set forth in 41 P.S. § 404(a). A lengthy quote by Benefact from *In re Roach,* 824 F.2d 1370, 1377–79 (3d Cir.1987), lends the inference that Benefact believes, under this theory, that, as under New Jersey law, the right to cure terminates upon the entry of a foreclosure judgment under Pennsylvania law. Such reasoning has never been squared with Pennsylvania law, in light of 41 P.S. § 404(a). *See In re Rivera,* 108 B.R. 553, 554 (Bankr.E.D.Pa.1989); and *In re Brown,* 75 B.R. 1009, 1011–12 (Bankr.E.D. Pa.1987). *Cf. In re Coleman,* 82 B.R. 15 (Bankr.D.N.J.1988) (doctrine of merger applied to allow debtors subject to New Jersey law to pay off a mortgage claim in full over the life of the plan).

There are at least two other reasons why this argument must be rejected. Firstly, it confuses the claim of a mortgagee, which references the entire balance of a mortgage debt which is the only referral of the doctrine of merger, with the curing of arrearages. *See, e.g., Epps, supra,* 110 B.R. at 706–09; and *In re Cole, Cole v. Cenlar Federal [Savings] Bank,* 122 B.R. 943, 948–49 (Bankr.E.D.Pa.1991). The merger doctrine indeed has relevance when considering a claim of the mortgagee for the entire balance due. See page 458 infra. However, in light of 41 P.S. § 404(a), it has no relevance to calculation of mortgage arrearages.

Secondly, as we established in *In re Stendardo*, 117 B.R. 833, 837 (Bankr.E.D. Pa.1990), not all of the terms of a mortgage are merged into a judgment and, hence, rendered null and void thereby. There is no logical reason for concluding that a mortgagor's federal rights under the MAP were one of the rights cut off by a state-court foreclosure judgment.

We therefore conclude that none of the arguments proffered by Benefact undermines our conclusion, in *Sciortino*, that the Debtor is entitled to invoke her participation in the MAP in calculating the arrearages owed to Benefact in the instant bankruptcy case, irrespective of the existence of a pre-petition foreclosure judgment against the Debtor.

2. THE DEBTOR WILL NOT BE PERMITTED TO CHALLENGE BENEFACT'S CALCULATIONS OF THE PAYMENTS DUE UNDER THE FORBEARANCE AGREEMENTS AT THIS JUNCTURE, AS THIS ISSUE WAS NOT RAISED IN THE PLEADINGS NOR TRIED WITH THE EXPRESS OR IMPLICIT CONSENT OF THE DEFENDANTS, AND THE PAYMENTS WERE THE SUBJECT OF CONTRACTUAL AGREEMENTS BETWEEN THE PARTIES WHICH CANNOT NOW BE RENOUNCED.

■ One of the principal arguments raised by the Debtor in her post-trial submissions is that HUD misapplied the terms of its own Handbooks in calculating the payments due from the Debtor in preparing Forbearance Agreements at certain points on the forbearance period, particularly when it required her to make claim at a trial without payments of $255.12, in excess of her regular mortgage payments, for the four-month period between October, 1982, and January, 1983. The Debtor contends that her arrearages should now be retroactively adjusted to account for her "excess" payments under that Agreement.

We note that this issue was not raised in the Debtor's Complaint, nor did the Debtor seek permission to amend her Complaint to add such a claim in the period of over 60 days between the filing of the Complaint and trial. Since this issue was not raised in

the pleadings, Benefact would be unfairly prejudiced if it had been compelled to muster a defense to this claim at trial without its consent.

The Court of Appeals has established that when

[t]he theory on which relief was ... granted had neither been raised in any of the pleadings nor been litigated with either the express or implicit consent of the parties [, the defendant] was denied a fair opportunity to defend against the theory ...,

*Evans Products Co. v. West American Insurance Co.*, 736 F.2d 920, 924 (3d Cir. 1984), and litigation based on the new theory cannot be permitted. *Accord, In re Railroad Dynamics, Inc.*, 97 B.R. 239, 247–48 (Bankr.E.D.Pa.1989). *See also In re A.I.A. Industries, Inc.*, 75 B.R. 1013, 1021–22 (Bankr.E.D.Pa.1987) (undue delay in amending pleadings not permissible.).

Furthermore, the Debtor is now seeking to reform the terms of a contractual Forbearance Agreement, which was executed by both parties as of October, 1982, over eight years ago, without having proven any mutual mistake or unilateral mistake occasioned by fraud or other wrongdoing on the part of HUD. *Compare In re CS Associates*, 121 B.R. 942, 952–55 (Bankr.E.D.Pa. 1990) (reformation of insurance contract permitted only because mistake was arguably mutually and was due to wrongful conduct of the insurer and it was proven that the insurer would have agreed to the terms of the contract as reformed); and *In re St. Mary Hospital*, 101 B.R. 451, 460–61 (Bankr.E.D.Pa.1989) (party held to terms of unambiguous contract even though both parties had interpreted its terms differently).

We also note that the only period in which HUD is alleged to have made an error is a four-month period, resulting in an increment of about $800 in payments due. This increment is more than offset by the windfall to the Debtor arising from HUD's policy of that era of not billing MAP participants during the pendency of their bankruptcy cases, which we find waives any payment obligation on the part of the Debt-

or during that period. This policy resulted in the elimination of any payment delinquency for a 22-month period, which apparently would have given rise to an increment in excess of $1,000 in the Debtor's arrearages.

We will therefore compute the Debtor's arrearages by reference to the amounts in the Foreclosure Agreements (or their equivalents) which the parts executed, and will not make allowances for alleged miscalculations by HUD in establishing the amount payable under these agreements.

### 3. THE DOCTRINE OF MERGER AND THE CONCLUSIVENESS OF THE STATE COURT FORECLOSURE JUDGMENT PREVENT THE DEBTOR FROM CHALLENGING THE USE OF THE FORECLOSURE JUDGMENT AS A BASIS FOR CALCULATING BENEFACT'S CLAIM.

■ In calculating the "total debt" of the Debtor to the Benefact, or the "true" claim of Benefact, the Debtor engages in an arcane set of calculations which purport to begin computations in 1979, factoring in the alleged principal and reductions of interest pursuant to a formula allegedly derived from *Santos,* and the alleged TILA recoupment due of 41,000. By these calculations, she arrived at a "total debt" figure of $36,638.55. While it is not readily apparent what the source of many of the figures used in the calculations is, it is quite clear that the CCP's foreclosure judgment is clearly not a referent in the Debtor's calculations.

However, in light of the doctrines of merger as described in such cases as *Klein, supra,* and *Herbert, supra,* referenced at page 456 *supra,* and the principle that bankruptcy courts are bound by judgments of courts of competent jurisdiction in their claim-evaluation process, *see, e.g., Heiser v. Woodruff,* 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946); and *In re Garafano,* 99 B.R. 624, 629–34 (Bankr. E.D.Pa.1989), we believe that the foreclosure judgment must be the starting point for calculation of Benefact's total claim. The fact that the mortgage was accepted for an assignment under the MAP

cannot and therefore does not affect the validity of the foreclosure judgment.

We refrain from utilizing the foreclosure judgment as a basis for calculation of the mortgagee's total claim in cases such as *Cole, supra,* at 945 n. 1, because in *Cole,* the mortgagee did not present any evidence relating to the entry of the judgment into the record and did not reference the judgment in post-trial submissions in any but a casual manner. By way of contrast, Benefact has emphasized the presence of the foreclosure judgment very prominently in its pleadings and at trial, to the extent of making a misplaced argument that it is relevant to the extent of computation of the Debtor's arrearages. See pages 455–57 *supra.*

In *Klein, supra,* 106 B.R. at 402 n. 7; and *Herbert, supra,* 86 B.R. at 438 n. 3, we explained that the proper computation of a claim of a mortgagee based upon a pre-petition foreclosure judgment is to add, to the amount of the judgment, interest at six (6%) percent per annum through the date of confirmation, at which time the deferral rate of interest is applied. We will follow that procedure in measuring the amount of Benefact's claim here.

### 4. THE DEBTOR'S CLAIM FOR A $1,000 RECOUPMENT PURSUANT TO THE TILA MUST BE DISMISSED.

■ In *Cobb, supra,* 122 B.R. at 26, we observed that "[w]hile the burden of proving compliance with the TILA is incumbent upon a lender once the debtor has provided some evidence or testimony that a TILA violation has occurred, the Debtor is initially obliged to provide some evidence of a TILA violation if such liability is to be imposed." Although the Debtor seems to believe she testified that she searched for an could not locate a TILA disclosure statement, we are unable to find any such testimony in the record. Furthermore, the Debtor's reliability as a historian was such that, like the debtor in *In re Caster,* 77 B.R. 8, 14 (Bankr.E.D.Pa.1987), we would be reluctant to find a violation on the basis of her testimony alone, unsubstantiated with an errant TILA statement or some other circumstances suggesting that a dis-

closure statement was not received by the Debtor.

The record here can be contrasted with the record in *Cole, supra.* There, although the Debtor failed to produce a defective TILA disclosure statement, she "was quite positive that she and her husband had received [the disclosure statement] ... [and] contended that she recalled reviewing the disclosure statement and noting that the statement had not recited that any security interest had been taken on her furniture." At 947. By way of contrast, like the debtor in *Cobb, supra,* 122 B.R. at 26, the Debtor here presented no evidence that Kirk, her initial mortgagee, failed to provide the appropriate disclosures, and hence that Lomas, Benefact, or HUD were liable for such violation. Therefore, Benefact was under no burden to prove its compliance with the TILA to avoid liability, and there is no support for the Debtor's claim for a TILA recoupment.

5. BENEFACT'S ARREARAGES WILL BE FIXED AT $16,517.32 AND ITS TOTAL CLAIM, AS OF MARCH 5, 1991, WILL BE FIXED AT $50,736.22; THESE CONCLUSIONS RENDER THIS DEBTOR'S PROSPECT FOR REORGANIZATION DOUBTFUL.

■ We can now proceed to calculate Benefact's rightful "claim" for arrearages and for its total claim against the Debtor applying the principles set forth herein. As our previous discussion at page 456 *supra* indicates, we will not consider the impact of the judgment in the calculation of arrearages owed to Benefact. However, we have also held that the judgment does not affect the right of the Debtor to take into account the terms of the forebearance agreements with HUD in calculating her arrearages. *See Sciortino, supra,* 120 B.R. at 374.77.

Furthermore, we will not consider the Debtor's arrearages which pre-dated her participation in the MAP in calculating Benefact's arrearages, as entrance into the MAP is intended to wipe the participant's slate clean of all prior arrearages. *See Sciortino, supra,* 120 B.R. at 378–79; *In re Santos,* Bankr.No. 87–03343F, Adv. No. 88–0438F, slip op. at 5–6 (Bankr.E.D.Pa. May 19, 1989); and *Santos, supra,* 97 B.R. at 236–38.

We therefore begin by calculating the total amount properly payable to HUD by the debtor over the period from the month that her first payment was due after her acceptance into the MAP, *i.e.,* October, 1980, to the filing of the instant bankruptcy case in May, 1989, as follows:

| | |
|---|---:|
| October, 1980, to December, 1980—$66 × 3 = | $ 198.00 |
| December, 1980 to September, 1982 (in Bankr. No. 80–03329K) (no billing) | 0. |
| October, 1982 to January, 1983—$255.12 × 4 = | 1,020.48 |
| February, 1983 to November, 1983—$50 × 10 = | 500.00 |
| December, 1983 to May, 1989 (payments plus late charges)—$255.12 × 66 = | 16,837.92 |
| GROSS ARREARAGES | $18,556.40 |

We are obliged to add certain components of the fees and costs enumerated in Benefact's proof of claim, *see* page 452 *supra,* to this figure. The attorneys' fees and sheriff's costs have been reduced, by stipulation of Benefact, to $300 and $933.20, respectively. We will allow Benefact's demand for reimbursement for a title

report, *see In re Garnett,* 99 B.R. 293 (Bankr.E.D.Pa.1989), as well as the costs to the Office of Judicial Support for filing of the complaint and filing the writ of execution and the sheriff's costs for service. *See, e.g., In re Vitelli,* 93 B.R. 889, 899–900 (Bankr.E.D.Pa.1988). The costs for recording an assignment of the mortgage and the prospective cost for recording the deed, which would be imposed only if a sheriff's sale were consummated, will not be allowed. Also disallowed will be the requests of Benefact in its claim for additional "late charges," which are in fact unexplained, and therefore unwarranted, service charges. The allowable costs can therefore be listed as follows:

| | |
|---|---:|
| Attorneys' Fee | $ 300.00 |
| Title Report | 156.00 |
| Office of Judicial Support's Costs | 148.25 |
| Sheriff's Costs | 955.75 |
| TOTAL | $1,560.00 |

Rejecting the Debtor's contention that she made pre-petition payments not included in HUD's records, we conclude that the Debtor's sporadic payment history, in the post-assignment period, yielded payments of only $6,165.28, the amount related in the parties' Stipulation of Facts.

We are also obliged to observe that substantial post-petition mortgage-payment arrearages have accrued, a factor which causes us to be puzzled at the Lomas's withdrawal of its motion for relief from the automatic stay. *See* page 452 *supra.* The period from June, 1989, through February, 1991, includes 20 months. The Debtor admittedly has made only one payment to Benefact on account of post-petition payments, the lump sum payment of $2,377.80 in May, 1990. While we are prepared to measure the payments in this period without late charges ($247.20) and allow the Debtor to cure her post-petition arrearages in her plan, since neither Lomas nor Benefact, its successor, have pressed for relief from the stay, *compare In re Ford,* 84 B.R. 40, 44 (Bankr.E.D.Pa.1988), these delinquencies must also be added to the calculation of arrearages. We compute the post-petition arrearages at $247.20 × 20 = $4944.00, less $2377.80, or $2566.20.

Our calculation of the total arrearages owed to Benefact by the Debtor is therefore as follows:

| | |
|---|---:|
| Pre-petition payments due | $18,556.40 |
| Allowance costs and fees | 1,560.00 |
| (Less) Pre-petition payments | (6,165.28) |
| Post-petition arrearages | 2,566.20 |
| NET ARREARAGES | $16,517.32 |

Benefact's total claim, as we indicated at pages 457–58 *supra,* must be calculated with reference to its foreclosure judgment of February 24, 1989, in the amount of $44,387.07. To this figure, we are obliged to add (1) interest at six (6%) percent through the date of confirmation; and (2) allowable post-judgment costs. The interest owing through February 24, 1991, is easily calculable by multiplying .12 times the judgment amount, which equals $5,326.45. The additional per diem accrual of interest ($44,387.07 × .01644) calculates to about $7.30. The allowable post-judgment costs include the costs of the filing of the writ execution at $24.00 and the sheriff's costs of $933.00. We therefore calculate the total claim of Benefact, as of March 5, 1991, the next scheduled confirmation hearing date, as follows:

| | |
|---|---:|
| Judgment amount | $44,387.07 |
| Interest $5326.45 + 65.70 | 5,392.15 |
| Allowable costs | 957.00 |
| | $50,736.22 |

We can now measure the Debtor's prospects for successful reorganization. The Debtor filed an Amended Plan on January 3, 1991, which, while continuing to improperly extend payments through January, 1995, instead of June, 1994, posited total funding of just over $12,000. This Plan is clearly not confirmable considering that, when a Trustee's commission of ten (10%) percent must be appended to the arrearages figure, about $18,250 must be paid to the Trustee to fund a feasible Plan which cures arrearages to date. Assuming that she complied with our Order of January 3, 1991, the Debtor has remitted about $600. She is therefore obliged to remit almost $18,000 in the remaining period of 40 months between March, 1991, and June,

1994. This would require payments of about $450 monthly, plus the Debtor's remittance of her regular monthly payments of $247.20.

We have considerable doubt as to whether the Debtor, given her very poor track record of payments over the past ten years, will be able to make payments in the magnitude of $700 monthly. However, as in the case of the *Cobb* debtor, whose case was ultimately dismissed on January 17, 1991, *see* 122 B.R. at 27, 28, there comes a time when over ten years of mortgage payments' delinquencies bears it necessary consequences. There is allegedly some possibility that the Debtor will receive financial assistance from her daughter which will permit her to formulate a confirmable Plan. However, we will require that such a Plan be produced and served upon Benefact, the Trustee, and the court in chambers by March 11, 1991; allow a 10-day period for filing objections until March 21, 1990 thereto; and schedule one final confirmation hearing in this case on March 26, 1991.

Needless to say, the Debtor's prospects of paying off Benefact's entire claim, even with help from her daughter, are even more bleak. While she would be entitled to credit her post-petition payment of $2,377.80 to HUD and her post-petition plan payments to the $50,736.22 figure, the Trustee's commission of at least $4,700 and likely deferral interest (at ten (10%) percent per annum) of about $9,200 would raise the total of payments to pay off the mortgage to over $60,000. Over a 40-month period, this would require monthly payments of over $1500. It is extremely unlikely that the Debtor could pay that much.

## E. CONCLUSION

An order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, to wit, this 5th day of March, 1991, after trial of the above-captioned adversary proceeding on December 6, 1990, and upon consideration of the par-

ties' post-trial submissions, it is hereby ORDERED and DECREED as follows:

1. Judgement is entered in part in favor of the Debtor, LOLA BLAKENEY ("the Debtor"), and against Defendants BENEFACT MORTGAGE and LOMAS MORTGAGE USA, INC. ("the Defendants").

2. The mortgage arrearages owed by the Debtor to the Defendants are fixed at $16,517.32, under the conditions set forth in the foregoing Opinion.

3. The secured loan of the Debtor to the Defendants is fixed at $50,736.22, as of March 5, 1991, plus $7.30 for each day thereafter until confirmation, under the conditions set forth in the foregoing Opinion.

4. Any Amended Plan proposed by the Debtor in light of and consistent with the conclusions reached in this Opinion shall be filed and served upon the Defendants' counsel, the Trustee, and the court in chambers on or before March 11, 1991.

5. Any Objection to the Debtor's Plan or any superseding Amended Plan shall be filed and served upon the Debtor's counsel, the Trustee, and the court in chambers on or before March 21, 1991, or shall be barred.

6. The continuation hearing and hearing on the Trustee's Motion to Dismiss, are re-scheduled on

TUESDAY, MARCH 26, 1991, AT 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718, United States Court House, 601 Market Street, Philadelphia, PA 19106).

7. In light of the long pendency of this case, if the Debtor is unable to achieve confirmation of her Plan or Amended Plan on March 26, 1991, the underlying case will be dismissed at that time.

8. *No continuance* of any of the time deadlines set forth herein will be entertained.

### ORDER AND MEMORANDUM SUR RECONSIDERATION AND CONFIRMATION

AND NOW, this 28th day of March, 1991, after hearings on the Debtor's Mo-

tion for Partial Reconsideration of our Opinion and Order of March 5, 1991, in the above-captioned adversary proceeding ("the Motion") and a hearing to consider confirmation of the Debtor's Second Amended Plan of Reorganization ("the Plan") in the Debtor's main bankruptcy case on March 26, 1991, and Objections of BENEFACT MORTGAGE ("Benefact") thereto, it is hereby ORDERED as follows:

1. The Motion is GRANTED in part.

We agree that we miscalculated the Debtor's late charges as $7.92 monthly. We previously found, and now reaffirm in light of the weight of evidence in the record, that the Debtor's regular monthly mortgage payment has at all pertinent times been $247.20. The parties' Stipulation of Facts and the Mortgage provide that the late charges are to be calculated at two (2%) percent of the monthly payment. Since the monthly payment is $247.20, the late charge should have been established as $4.94 monthly. Therefore, in measuring the payments due from December, 1983, to May 1989, including late charges at $7.92 monthly, we calculated an erroneous extra amount of $2.98 for each of 66 months, a total excess of $196.68.

However, we also believe that we erred in failing to add late charges, when appropriate, to the Debtor's post-petition delinquent payments. Therefore, the $196.68 reduction must be partially offset by our adding late charges of $4.94 monthly to the post-petition payments due between June, 1989, and May 16, 1990, when the Debtor remitted $2,377.80. The inclusion of late charges for this 12–month period results in additional post-petition arrearages of $59.28. Consequently, the mortgage arrearages fixed in our Order of March 5, 1991, must be reduced by $196.68 minus $59.28, or $137.40, reducing Benefact's arrearages to $16,379.92.

We continue to reject the Debtor's contention that we should recalculate the forebearance payments due between October, 1982, and January, 1983. As before, we continue to find the generalized references in the Complaint to the formula for determining forebearance payments under the Mortgage Assignment Program ("MAP") insufficient to raise the issue that payments were miscalculated in the pleadings. The Debtor's questions regarding these calculations to Joanne Peak at trial were allowed in the face of Benefact's opposition, not its concurrence. The Debtor does not address our holding that, in any event, it is inappropriate to reform the forebearance contract eight years after it was totally performed.

■ The Debtor also asks us to "reconsider" our calculation of the total secured claim of Benefact in light of the fact that she plans to reinstate the mortgage, which allegedly will eliminate the effect of the judgment which was the basis for our calculation of the claim. As a bankruptcy court measuring Benefact's claim against the Debtor, we are charged only with determining the arrearages and total mortgage balance owed to Benefact which must be liquidated under the Debtor's plan. After the plan is consummated and the case is discharged and closed, the parties' relationship will be regulated by state law. It is not appropriate for this court to dictate how, in certain contingencies which may or may not occur, state law should be applied. Post-discharge intervention by this court in determination of the parties' rights would appear to be appropriate only if the state courts refuse to properly apply our decisions. We cannot and will not assume that state courts will have any difficulty in properly applying our decisions.

2. Benefact's Objections to confirmation are OVERRULED.

■ The Plan is feasible. There is little doubt that, with her daughter's contribution of a lump sum payment sufficient to liquidate the arrearages balance, the Debtor can and will be able to meet the payment terms demanded by the Plan. *See In re Fricker*, 116 B.R. 431, 440 (Bankr.E.D.Pa. 1990); *In re 222 Liberty Associates*, 108 B.R. 971, 985–87 (Bankr.E.D.Pa.1990); and *In re Capodanno*, 94 B.R. 62, 64–65 (Bankr.E.D.Pa.1988).

3. The Debtor is granted leave to file a Third Amended Plan which will take into

consideration the slight amendment to the arrearages of Benefact set forth in paragraph one hereof. If the Debtor chooses, she may file a Third Amended Plan, changing only the amount funded by the Plan by no more than $137.40, and serve same upon the Defendants' counsel, the Trustee, and the court in chambers, on or before April 3, 1991. If no Amended Plan is filed in accordance herewith, the Plan will be confirmed as it presently stands.

4. Any Objection to the amendments opposing the Debtor's Third Amended Plan shall be filed and served upon the Debtor's counsel, the Trustee, and the court in chambers on or before April 8, 1991, or shall be barred. Any such Amended Plan may be confirmed without a further hearing.

5. In light of the long pendency of this case, strict conformity to the time deadlines set forth herein is required and any failure of the Debtor to adhere to these deadlines may result in immediate dismissal of this case without a further hearing.